Case No. 25-70002

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

ALAN DALE WALKER, Petitioner

v.

BURL CAIN, DIRECTOR,
MISSISSIPPI DEPARTMENT OF CORRECTIONS AND
LYNN FITCH, ATTORNEY GENERAL, Respondents.

——————————————

Appeal from the United States District Court
for the Southern District of Mississippi

——————————————

MOTION FOR CERTIFICATE OF APPEALABILITY
AND SUPPORTING MEMORANDUM OF LAW

——————————————

James W. Craig, MSB # 7798
Hannah Lommers-Johnson
The Roderick & Solange MacArthur
Justice Center
4400 South Carrollton Ave.
New Orleans, LA 70119
(504) 620-2259 (p)/(504) 208-3133 (f)
jim.craig@macarthurjustice.org

David P. Voisin, MSB #100210
P.O. Box 8044
Hammond, LA 70404
(601) 842-0332 (c)
david@dvoisinlaw.com

COUNSEL FOR PETITIONER-APPELLANT

**CERTIFICATE OF INTERESTED PARTIES**

The undersigned counsel of record certifies that the following listed persons as described in Rule 28.2.1 have an interest in the outcome of the case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

1.  Petitioner, Alan Dale Walker.

2.  Family of Konya Edwards

3.  Counsel for Petitioner: David P. Voisin, James W. Craig, and Hannah Lommers-Johnson

4.  Counsel for Respondents: Allison Hartman and LaDonna Holland

*s/James W. Craig*
Counsel for Petitioner

2

**REQUEST FOR ORAL ARGUMENT**

Petitioner raises two claims that would benefit from oral argument. The first involves a challenge to the state court adjudication of a claim arising under *Batson v. Kentucky*, 476 U.S 79 (1986). Recently, the Supreme Court found Mississippi's application of *Batson* unreasonable because the state courts did not appropriately adjudicate the third step of *Batson*. *See Pitchford v. Cain,* No. 24-7351, 2026 U.S. LEXIS 2296 (U.S. May 28, 2026)  Walker's case presents another instance of the Mississippi courts to apply *Batson* in accordance with clearly established law.

An ineffective assistance of counsel claim turns on trial counsel's admission that he failed to prepare for the penalty phase. Additionally, Walker's evidence, including two mental health experts, went unrebutted at the evidentiary hearing, yet the trial court found no prejudice, and the Mississippi Supreme Court did not address the question of prejudice. Oral argument will assist the Court in applying 28 U.S.C. § 2254(d) to these facts.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES ........................................................................ 2

REQUEST FOR ORAL ARGUMENT ................................................................................ 3

TABLE OF CONTENTS ...................................................................................................... 4

TABLE OF AUTHORITIES ................................................................................................ 6

JURISDICTIONAL STATEMENT ..................................................................................... 9

STANDARD OF REVIEW .................................................................................................. 9

STATEMENT OF ISSUES FOR WHICH A COA IS REQUESTED.................................. 10

STATEMENT OF THE CASE.............................................................................................. 10

SUMMARY OF ARGUMENT ............................................................................................ 11

**I.** THIS COURT SHOULD GRANT A CERTIFICATE OF APPEALABILITY TO REVIEW WALKER'S CLAIM THAT THE STATE EXERCISED PEREMPTORY CHALLENGES AGAINST PROSPECTIVE JURORS BECAUSE OF THEIR RACE, IN VIOLATION OF THE FOURTEENTH AMENDMENT ........................................ 13

    **A.** Facts Relevant to *Batson* Claim.......................................................................... 13

        **1.** First challenge: Lillian Rush.......................................................................... 14

        **2.** Second challenge: Pauline Lewis.................................................................... 14

        **3.** Third challenge: Willie Harper ...................................................................... 15

        **4.** Fourth challenge: Lewis Burke ...................................................................... 16

    **B.** Rulings of the State Courts and District Court ...................................................... 16

    **C.** The State Court unreasonably applied *Batson* when it failed to conduct a "step three" evaluation of the prosecutor's purported reasons for striking jurors Lewis and Harper. ..... 19

        **1.** The state courts abdicated their duty under Batson and its progeny to evaluate prosecutors' purported reasons for challenged strikes and complete step three. .............. 21

        **2.** The state courts failed to comply with Batson's requirement to consider all relevant circumstances that bear on the issue of racial animus in evaluating a Batson challenge and ignored evidence of racially disparate treatment by the prosecutor. ............................... 24

            **a.** Pauline Lewis.......................................................................................... 26

            **b.** Willie Harper .......................................................................................... 32

    **D.** This Court should grant a certificate of appealability on the Batson claim regarding prospective jurors Lewis and Harper. .................................................................................. 36

**II.     THE COURT SHOULD GRANT A COA TO CONSIDER COUNSEL'S UNREASONABLE EXPECTATION OF A PLEA BARGAIN AND FAILURE TO DEVELOP AND PRESENT MITIGATING EVIDENCE** ...................................................... 37

    **A.**   Counsel admittedly did not prepare for the penalty phase............................................ 39

       **1.**   Facts from trial and the PCR hearing......................................................... 39

       **2.**   The post-conviction court relied on the competency evaluation which had never been introduced at the hearing; and then denied Walker a chance to respond to the report. 44

       **3.**   Stegall was disbarred for failing his clients. ............................................ 45

    **B.**   The state court finding that trial counsel's performance was adequate involved an unreasonable application of clearly established law or unreasonable findings of fact. ........ 46

    **C.**   The trial court's conclusion that there was no prejudice involved an unreasonable application of clearly established law and unreasonable fact-findings................................. 58

       **1.**   Walker suffered repeated trauma growing up neglected an**d** unsupervised in a highly sexualized environment. ...................................................................... 59

       **2.**   Without adequate supervision, Walker came under the malign influence of older men in his neighborhood................................................................................ 69

       **3.**   Walker lacked the structure that his father had provided during his time in Alaska. 71

       **4.**   Walker suffered neurological dysfunction often found in those who suffered trauma during childhood. ........................................................................................ 74

    **D.**   There is a reasonable likelihood that, hearing evidence of the genesis of Walker's dysfunctional sexual development, at least one juror would have voted for a life sentence. 76

CONCLUSION.......................................................................................................... 89

# TABLE OF AUTHORITIES

## Cases

*Abdul-Salaam v. Sec'y of PA Dep't of Corr.,* 89 F.3d 254 (3rd Cir. 2018) ............................ 49, 79

*Anderson v. Sirmons,* 476 F.3d 1131 (10th Cir. 2007) ...................................................... 77

*Andrus v. Texas,* 590 U.S. 806 (2020) ............................................................................ 47, 49

*Barefoot v. Estelle*, 463 U.S. 880 (1983) ...................................................................... 36

*Brumfield v. Cain*, 576 U.S. 305 (2015) ........................................................................ 54

*Buck v. Davis*, 580 U.S. 100 (2017) ............................................................................... 9

*Davis v. State*, 660 So.2d 1228 (Miss.1995) .............................................................. 17

*Dolphy v. Mantello,* 552 F.3d 236 (2nd Cir. 2009) ................................................... 32

*Ex parte Travis,* 776 So.2d 874 (Ala. 2000) ............................................................... 26

*Ferrell v. Hall*, 640 F.3d 1199, (11th Cir. 2011) ....................................................... 79

*Flowers v. Mississippi*, 588 U.S. 284 (2019) .......................................................... 36, 37

*Ford v. Wainwright,* 477 U.S. 399 (1986) .................................................................. 54

*Foust v. Houk,* 655 F.3d 524 (6th Cir. 2011) ............................................................. 49

*Frazier v. Huffman,* 343 F.3d 780 (6th Cir. 2003) .................................................... 79

*Fulgham v. State,* 46 So. 3d 315 (Miss. 2010) .......................................................... 86

*Gardner v. Florida*, 430 U.S. 349 (1977) ................................................................... 54

*Gardner v. Johnson*, 247 F.3d 551 (5th Cir. 2001) ................................................... 87

*Haliym v. Mitchell*, 492 F.3d 680 (6th Cir. 2007) ................................................ 52, 78

*Hamblin v. Mitchell,* 354 F.3d 482 (6th Cir. 2003) .................................................. 79

*Hardwick v. Secretary, Fla. Dept. of Corrections*, 803 F.3d 541 (11th Cir. 2015) ...................... 51

*Hernandez v. New York*, 500 U.S. 352 (1991) .......................................... 11, 17, 19, 24

*Hughes v. State*, 735 So.2d 238 (Miss.1999) .............................................................. 17

*Hutto v. State,* 227 So. 3d 963 (Miss. 2007) .............................................................. 86

*Jells v. Mitchell,* 538 F.3d 478 (6th Cir. 2008) ........................................................ 79

*Lockett v. Anderson*, 230 F.3d 695 (5th Cir. 2000) .......................................... 58, 79, 81

*Lockett v. State*, 517 So.2d 1346 (Miss. 1987) .................................................. 17, 32, 35

*Mack v. State*, 650 So.2d 1289 (Miss.1994) .............................................................. 17

*Manning v. State*, 726 So.2d 1152 (Miss.1998) ......................................................... 17

*Mason v. Mitchell,* 543 F.3d 766 (6th Cir. 2008) ..................................................... 79

*McGahee v. Alabama Dep't of Corr.,* 560 F.3d 1252 (11th Cir. 2009) ...................... 32

*Miller v. Johnson*, 200 F.3d 274 (5th Cir. 2000) ...................................................... 10

*Miller-El v. Cockrell*, 537 U.S. 322 (2002) ............................................................ 9, 36

*Miller–El v. Dretke,* 545 U.S. 231 (2005) .................................................. 24, 25, 26, 37

*Neal v. Vannoy,* 78 F.3d 775 (5th Cir. 2023) ..................................................... 51, 52, 83

*Noguera v. Davis,* 4 F.3d 1020 (9th Cir. 2021) ..................................................... 48, 78

*Panetti v. Quarterman,* 551 U.S. 930 (2007) ............................................................. 54

*Pitchford v. Cain,* No. 24-7351, 2026 U.S. LEXIS 2296 (U.S. May 28, 2026) ........... 3, 20, 31, 36

*Porter v. McCollum,* 558 U.S. 30 (2009)........................................................................ 46, 58, 85

*Purkett v. Elem*, 514 U.S. 765 (1995) ...................................................................................... 20, 24

*Ramey v. Davis*, 942 F.3d 241 (5th Cir. 2019) ............................................................................... 36

*Randall v. State,* 806 So. 2d 185 (Miss. 2001) ............................................................................... 86

*Reed v. Quarterman*, 555 F.3d 364 (5th Cir. 2009)................................................................... 25, 36

*Rompilla v. Beard*, 545 U.S. 374 (2005)......................................................................... 47, 51, 52, 77

*Saranchak v. Secretary, Pennsylvania Dept. of Corrections*, 802 F.3d 579 (3rd Cir. 2015) ....... 51

*Sears v. Upton* ..................................................................................................................... 48, 78, 89

*Singleton v. Stegall*, 580 So. 2d 1242, 1246 (Miss. 1993)............................................................. 45

*Slack v. McDaniel,* 529 U.S. 473 (2000) ...................................................................................... 9, 36

*Stegall v. Mississippi Bar*, 618 So. 2d 1291 (Miss. 1993). ............................................................ 45

*Strickland v. Washington*, 466 U.S. 668 (1984) ........................................................... 58, 76, 81, 85

*Stringer v. Black*, 503 U.S. 222, 229 (1992)................................................................................... 81

*United States v. Al-'Owhali*, 691 F. Supp. 2d 441 (S.D.N.Y. 2010) .............................................. 88

*United States v. Alexis Candelario Santana*, Crim. No. 09-427, 2013 WL 101615 (D.P.R. Jan. 8, 2013) ........................................................................................................................................... 88

*United States v. Bass*, 460 F.3d 830 (6th Cir. 2006).................................................................... 88

*United States v. Beckford*, 211 F.3d 1266 (4th Cir. 2000)............................................................. 88

*United States v. Edelin*, 134 F. Supp. 2d 59 (D.D.C. 2004) ......................................................... 88

*United States v. Gilbert*, 92 F. Supp. 2d 1 (D. Mass Mar. 26, 2001)........................................... 88

*United States v. Johnson*, 219 F.3d 349 (4th Cir. 2000).............................................................. 88

*United States v. Kehoe*, No. 97-243-(1), 2008 WL 4079316 (E.D. Ark. Aug. 28, 2008)............. 88

*United States v. Moore*, No. 00-157-2, 2005 WL 6797098 (D.D.C. Mar. 9, 2005) ..................... 88

*United States v. Pitera*, 5 F.3d 624 (2d Cir. 1993) ....................................................................... 88

*United States v. Williams*, No. 00-1008, 2011 WL 3296101 (S.D.N.Y. July 28, 2011) .............. 88

*Walker v. Mississippi*, 519 U.S. 1011 (1996) ................................................................................ 20

*Walker v. State,* 131 So. 3d 562 (Miss. 2013)................................................................................ 11

*Walker v. State,* 303 So. 3d 720 (Miss. 2020).......................................................................... passim

*Walker v. State,* 671 So. 2d 581 (Miss. 1995)........................................................................... passim

*Walker v. State,* 863 So. 2d 1 (Miss. 2003).................................................................... 10, 18, 19

*Wiggins v. Smith*, 539 U.S. 510 (2003)........................................................................ 46, 49, 58, 89

*Wiggins*, 539 U.S. at 537 .............................................................................................................. 82

*Williams v. Allen,* 542 F.3d 1326 (11th Cir. 2008)........................................................................ 51

*Williams v. Stirling*, 914 F.3d 302 (4th Cir. 2019) .................................................................. 52, 78

*Williams v. Taylor,* 529 U.S. 362 (2000) ................................................................... 46, 49, 77

*Wilson v. Sellers*, 584 U.S. 122 (2018) ......................................................................................... 46

*Wilson v. State,* 21 So. 3d 572 (Miss. 2009)................................................................................ 86

## Statutes

28 U.S.C. § 1291 ........................................................................................... 9

28 U.S.C. § 2253 ........................................................................................... 9

28 U.S.C. § 2254 ........................................................................................... 9

28 U.S.C. § 2254(d) .......................................................................... 3, 18, 21, 46

Miss. Code Ann. § 99-19-103 ......................................................................... 82

Miss. Code Ann. §99-19-101(2)(c) .................................................................. 81

## JURISDICTIONAL STATEMENT

The district court exercised jurisdiction over the matters addressed herein pursuant to 28 U.S.C. § 2254. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253. The district court denied relief on September 25, 2026, ROA.2642, and denied a timely filed motion to alter or amend the judgment on January 8, 2026. ROA.2754. The notice of appeal was filed on January 30, 2026. ROA.2759.

## STANDARD OF REVIEW

A Certificate of Appealability (COA) must issue if a habeas petitioner shows "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel,* 529 U.S. 473, 484 (2000) (quote omitted). A COA does not require a showing that the appeal will succeed. *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2002); *see also Buck v. Davis*, 580 U.S. 100, 115 (2017) ("The COA inquiry, we have emphasized, is not coextensive with a merits analysis."). Furthermore, "[i]t is consistent with § 2253 that a COA will issue in some instances where there is no certainty of ultimate relief. Indeed, a claim can be debatable even though every jurist of reason might agree, after the COA has been granted and the case has received full consideration, that petitioner will not prevail." *Id.* at 338; *Buck*, 580 U.S. at 117. "Any doubt whether to grant a COA is resolved in favor of the petitioner, and the severity of the

penalty may be considered in making this determination." *Miller v. Johnson*, 200 F.3d 274, 280 (5th Cir. 2000).

## STATEMENT OF ISSUES FOR WHICH A COA IS REQUESTED

I. Whether this court should grant a certificate of appealability to review Walker's claim that the state exercised peremptory challenges against prospective jurors because of their race, in violation of the Fourteenth Amendment?

II. Whether the court should grant a COA to consider counsel's unreasonable expectation of a plea bargain and failure to develop and present mitigating evidence.

## STATEMENT OF THE CASE

Alan Walker was convicted and sentenced to death for the murder of Konya Edwards. The Mississippi Supreme Court affirmed the judgment of the lower court. *Walker v. State (Walker I),* 671 So. 2d 581 (Miss. 1995). His initial state PCR petition was also denied. *Walker v. State (Walker II),* 863 So. 2d 1 (Miss. 2003). Walker then filed a federal habeas petition on October 18, 2004. ECF No. 20.[1] The court denied Respondents' motion to dismiss, ROA.292, and the parties submitted briefing on the merits. ROA.1392; ROA.1724; ROA.1969. Because of changes in state procedural law, Walker filed a successive state court petition and moved to stay federal proceedings, but this was denied. ROA.2028; ROA.2097. The court entered

---

[1] For reasons unknown to Walker or his attorneys, this document is not included in the Record on Appeal; in any event, as noted below, an Amended and Supplemental Petition was filed. ROA.2352.

an opinion denying relief and or order denying a COA. ROA.2098, 2204. Walker moved to alter or amend the judgment and reasserted his request for a stay. ROA.2206, 2311. The lower court granted the stay. ROA.2320.

In state successive proceedings, the Mississippi Supreme Court found that initial state PCR counsel performed deficiently and remanded Walker's case for an evidentiary hearing on the challenge to trial counsel's penalty phase performance. *Walker v. State (Walker III),* 131 So. 3d 562 (Miss. 2013). Following a hearing, the trial court denied relief, and the Mississippi Supreme Court affirmed that order. *Walker v. State (Walker IV),* 303 So. 3d 720 (Miss. 2020).

Returning to federal court, Walker filed an amended petition. ROA.2352. After additional briefing, the district court entered a memorandum opinion denying relief. ROA.2622. The lower court also denied a timely filed motion to alter or amend the judgment. ROA.2754. Walker filed his notice of appeal. ROA.2759.

## SUMMARY OF ARGUMENT

I.  Under *Batson v. Kentucky*, 476 U.S. 79 (1986), a trial court must assess whether reasons given by a prosecutor to justify a peremptory strike are a pretext for discrimination by considering all facts having a bearing on the issue. The state court failed to conduct this inquiry even when defense counsel pointed to the disparate treatment of jurors of different races. Instead, the Mississippi Supreme Court, contrary to *Batson* and *Hernandez v. New York*, 500 U.S. 352, 359 (1991), focused

on the strength of a prima facie case even though the prosecutor attempted to explain the strikes. Additionally, the trial court stopped the inquiry after ascertaining whether the state reason was race neutral without proceeding to the third step of *Batson*'s test.

II.      Trial counsel admitted that he was so convinced that he was either going to get a plea offer or even get an acquittal that he did not focus on the penalty phase. On the Saturday before trial began, he learned that Jason Riser, the co-indictee, reached an agreement with the State and planned to testify. Counsel's unrealistic expectations of not need to prepare for the penalty phase were dashed. After Walker was convicted, counsel could do little more than call witnesses who were present, and even then, counsel was not prepared to elicit any compelling mitigating evidence. At the post-conviction evidentiary hearing, Walker presented a number of lay witnesses and unrebutted expert witnesses about the trauma he endured and the adverse consequences of growing up unsupervised in an isolated neighborhood in which there were no sexual boundaries, incest and sexual abuse were common, and where older men exploited boys, encouraging them to use alcohol and drugs and steal for them. Had counsel presented this evidence, there is a reasonably probability that at least one juror would have voted for a life sentence.

**ARGUMENT**

**I.** **THIS COURT SHOULD GRANT A CERTIFICATE OF APPEALABILITY TO REVIEW WALKER'S CLAIM THAT THE STATE EXERCISED PEREMPTORY CHALLENGES AGAINST PROSPECTIVE JURORS BECAUSE OF THEIR RACE, IN VIOLATION OF THE FOURTEENTH AMENDMENT**

At Walker's trial in Vicksburg, the prosecution exercised seven peremptory challenges. Four of those were used to block Black citizens from the jury. Although Walker discussed all four of these challenges in the state courts and before the district court, he only seeks a certificate of appealability regarding the state court's rulings on two of Walker's *Batson* objections: the peremptory strikes of Pauline Lewis and Willie Harper. Even the district court found the strike of juror Lewis to be "a close call," and characterized the prosecutor's explanation as "vague." ROA.2146-47.

**A. Facts Relevant to *Batson* Claim**

At trial, prosecutors used four of their seven peremptory challenges against Black jurors. ROA.6236-49. Prosecutors' strikes 2, 4, 5 and 6 were each used to eliminate Black jurors. Following each of these strikes, defense counsel objected under *Batson* and requested that the prosecutor be required to provide the reasons for the strike. ROA.6237:2-19 (Rush), ROA.6238:19-6239:18 (Lewis), ROA.6244:4-20 (Harper), ROA.6244:20-6245:9 (Burke).

### 1. *First challenge: Lillian Rush*

After the first *Batson* challenge, regarding Juror Lillian Rush, the trial court noted that no "particular pattern has been established here" but stated that "If the State has any concerns about it, I'll have you go ahead and do that." ROA.6237:5-15. The prosecution did so, stating "We made an objection to this juror for cause, and I believe that the record will support it." ROA.6237:16-18.

### 2. *Second challenge: Pauline Lewis*

After the prosecutors' second peremptory strike of a Black juror, the defense again objected. This time the trial court turned to the State and asked, "What are your reasons?" ROA.6238:23-24. The prosecutor indicated that he struck Juror Pauline Lewis because she had a teenage daughter, and because he "felt like she was dealing with some problems that we weren't able to reach." ROA.6238:25-29.

Defense counsel pointed out that the prosecution had declined to exercise peremptory challenges against multiple white jurors who had teenage children and had accepted them as jurors.[2] The prosecutor responded, "All of whom responded in a manner that allayed whatever concerns the state had. The demeanor exhibited

---

[2] "We would like the record to reflect if that's his reasons, judge, that Sylvia Foster has teenage children; . . . Elaine Watkins, who they have accepted, had teenage children; that Don Thompson, who they have accepted, had teenage children; that McDavid Shows had teenage children that they've accepted." ROA.6239:2-8. Defense counsel later added juror Nobles to the list of white individuals with teenage children who had been accepted by the State. ROA.6240:10-13. Defense counsel further made clear that the record reflected that the jurors he raised as similarly situated to Ms. Lewis were white. ROA.6240:10-13.

by Ms. Lewis did not satisfy that." ROA.6239:9-12.

However, the prosecution had not asked Juror Lewis any questions regarding her daughter—the fact that she had a daughter who was teenaged or older had come in response to defense questioning, to which Juror Lewis' only response was to ask, "Did you say teenager or older?" and then raised her hand. ROA.5959:9-11.

The seated white jurors with teenaged or older daughters whose demeanors had purportedly allayed the concerns of the State were, like Ms. Lewis, also not asked any questions by the State regarding their children, and, like Ms. Lewis, also simply responded to the defense attorney's questioning by raising their hands or nodding. ROA.5958:24-25 (Watkins); ROA.5958:26-28 (Thompson); ROA.5959:13-15 (Shows, who said "[t]hree of them"); ROA.5959:21-25 (Nobles).

The prosecutor gave no indication of what demeanor he observed Ms. Lewis to have, or in what way Ms. Lewis' demeanor was allegedly unacceptable to him. ROA.6239:9-12. The trial court accepted the prosecutor's purported reason for the strike. ROA.6239:13-18.

### 3. Third challenge: Willie Harper

Following the prosecution's third peremptory strike of a Black juror, Juror Willie Harper, the defense again raised a *Batson* challenge. ROA.6244:4-6. Here, the trial court opted to provide its own race neutral reason for the strike, saying, "I will certainly take note of the fact that there was substantial reason for striking that

juror no matter what her race would be . . . . because of her chickens and her pigs and her children." ROA.6244:7-19. Willie Harper had indicated during voir dire that being sequestered would prevent her from caring for her chickens and pigs, and that she preferred to be home with her 23-year-old daughter. ROA.5973:2-5978:20. After the examination, the Court asked if the parties wanted to excuse her by agreement; when defense counsel declined to do so, the Court stated, "on what she said, I can't excuse her for cause." ROA.5978:19-20.

### 4. *Fourth challenge: Lewis Burke*

Following the prosecution's fourth peremptory strike of a Black juror, Juror Lewis Burke, the prosecutor offered his reason for the strike, stating "He was a member of the board of directors of the Capital Defense Fund." ROA.6244:20-6245:1. The trial court responded, "All right, I'll accept that as a reason." ROA. 6245:8-9.

### B. Rulings of the State Courts and District Court

On direct appeal, the Mississippi Supreme Court stated both that "the full *Batson* analysis was not triggered as no showing of a pattern of purposeful discrimination was ever demonstrated by Walker," *Walker I*, 671 So.2d at 627, and that the reasons given by the prosecutor for the strikes was race neutral, *id*. at 627-28 (Pauline Lewis), *id*. at 628 (Willie Ann Harper and Lillian Rush), *id*. at 629 (Lewis Burke). To the Mississippi Supreme Court, the reasons provided were

16

acceptable because they all fell within the general categories of race neutral reasons listed in *Lockett v. State*, 517 So.2d 1346, 1356 (Miss. 1987). For instance, the Court held that the strikes of Pauline Lewis purportedly because of her demeanor, and the strike of Willie Harper purportedly because her attention "was taken by caring for her animals and garden" in addition to her job fell into the categories of demeanor and employment, both of which had been deemed acceptable race neutral reasons in *Lockett*. *Walker*, 671 So.2d at 627-28.

On post-conviction review, Walker claimed that his attorneys provided ineffective assistance of counsel by failing to make a complete record of the race of the venire, which prejudiced his ability to demonstrate a prima facie case of racial discrimination. In response, the Mississippi Supreme Court retracted any suggestion that the basis of its *Batson* ruling was the lack of a prima facie case of racial discrimination. The state court held:

> It has long been the law that when the prosecution states its reasons for exercising its peremptory strikes either when ordered to do so without a finding of a prima facie case or voluntarily, the reasons can be reviewed on appeal. *See Hernandez v. New York*, 500 U.S. 352, 352-54, 111 S.Ct. 1859, 1862-63, 114 L.Ed.2d 395, 396 (1991); *Hughes v. State*, 735 So.2d 238, 250 (Miss.1999); *Manning v. State*, 726 So.2d 1152, 1183 (Miss.1998); *Davis v. State*, 660 So.2d 1228, 1240 (Miss.1995); *Mack v. State*, 650 So.2d 1289, 1298 (Miss.1994); *Foster v. State*, 639 So.2d at 1279-80. In accord with this precedent, this Court reviewed, on the merits, the reasons put forward by the prosecution for the exercise of its strikes in this

17

case. The Court found these reasons to be sufficient and denied Walker's claim under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). *Walker*, 671 So.2d at 627-29.

*Walker II,* 863 So. 2d at 28 ¶ 85. The State cited this language in the brief it filed in the district court opposing Walker's habeas corpus petition. ROA.1776-77.

Thus, the question before the district court was whether the state court's holding that the prosecution's peremptory challenges were race-neutral was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (2).

The district court adjudicated this issue in its 2012 opinion. After a lengthy recitation of the facts and the state court's opinions, the district court held:

> This Court's denial of habeas relief is based primarily on the ruling of the trial court and the appellate court that Walker failed to present a prima facie case of racial discrimination in jury selection. Even if a prima facie case had been proved, however, the state court's opinion affirming the strikes of Burke, Harper, Lewis, and Rush does not offend clearly established federal law. Habeas relief is not warranted here.

ROA.2147-48.

**C. The State Court unreasonably applied *Batson* when it failed to conduct a "step three" evaluation of the prosecutor's purported reasons for striking jurors Lewis and Harper.**

The state court made, at best, a perfunctory evaluation of the prosecutor's proffered reasons for his strikes of Ms. Lewis and Ms. Harper. As will be discussed below, the voir dire record does not support the findings made by the state court regarding these two jurors. Further, the state court ignored clear evidence of disparate treatment of similarly situated white jurors raised by defense counsel.

This violates the essential tenets of *Batson*, which require that (1) strike explanations by prosecutors be evaluated in all cases in which they are proffered followed by the completion of *Batson's* third step, and (2) all circumstances that bear on the issue off racial animus be taken into account in evaluating *Batson* challenges, particularly including evidence of disparate treatment of jurors of different races.

As the Mississippi Supreme Court belatedly held on post-conviction review, the Supreme Court has expressly held that when a prosecutor provides their reasons for a strike that is the subject of a *Batson* challenge, the trial court is required to consider whether the prosecutor's proffered reasons are genuine and race neutral. *Walker II*, 863 So. 2d at 28 ¶ 85. This requirement exists regardless of whether the trial court has yet determined that a prima facie case of discrimination exists. *Hernandez v. New York*, 500 U.S. 352, 359 (1991).

Thus, following the statement of the prosecutor's purported reasons for the challenged strike and the defense's response to same, the trial court must then complete the third step of the *Batson* inquiry and determine whether purposeful discrimination is evident. *Purkett v. Elem*, 514 U.S. 765, 769 (1995) (finding that the trial court's "inquiry properly proceeded to step three" of *Batson* after the prosecutor volunteered reasons for the challenged strikes even though the trial court never found a prima facie case of discrimination).[3]

In the instant case, the trial court unreasonably neglected to meet these requirements, thus failing to properly evaluate the prosecutors' purported reasons for the peremptory challenges of Ms. Lewis and Ms. Harper and complete the third step of the *Batson* inquiry, even though defense counsel contested the reasons given by the prosecutor. *Pitchford v. Cain,* No. 24-7351, 2026 U.S. LEXIS 2296 (U.S. May 28, 2026) (court has obligation to address preserved *Batson* claim). On appellate review the Mississippi Supreme Court let this misapplication of *Batson* stand, originally holding on direct appeal that the prosecutors' explanations for its strikes of four Black jurors were unnecessary to evaluate because no prima facie case had been found. *Walker I,* 671 So 2d at 629. In the same opinion, the court failed to consider the evidence of the prosecutor's disparate treatment of white and

---

[3] Both *Hernandez* and *Purkett* were decided by the Supreme Court before the denial of certiorari in Walker's direct appeal. *Walker v. Mississippi*, 519 U.S. 1011 (1996) (decision rendered Dec. 2, 1996).

Black potential jurors and held that that the reasons offered by prosecutors were facially sufficient because they each fell into a general category of race neutral reasons (e.g., employment) that had been deemed acceptable in other *Batson* cases. When, on post-conviction review, the Mississippi Supreme Court discarded its reliance on a purported absence of a prima facie case of discrimination, its ruling rested on the meager analysis of the prosecutor's proffered reasons.

The unreasonable adjudication of Petitioner's *Batson* claims made by these courts in failing to evaluate the prosecution's strike explanations in light of the complete voir dire record, ignoring both the actual responses of the jurors and the evidence of disparate treatment of jurors by the prosecution, and neglecting to complete the third step of the *Batson* inquiry defies the clear mandate of the United States Supreme Court set out in *Batson* and its progeny and satisfies the requirements of 28 U.S.C. § 2254(d)(1) and (2) for habeas relief.

> ### 1. The state courts abdicated their duty under <u>Batson</u> and its progeny to evaluate prosecutors' purported reasons for challenged strikes and complete step three.

The United States Supreme Court has emphasized the importance of the trial court's duty to make factual findings as to prosecutors' proffered strike reasons once they are provided to the court, especially if defense counsel pointed to disparate treatment of jurors based on race. Where peremptory challenges "invoke a juror's demeanor" as is common, "the trial court must evaluate not only whether

the prosecutor's demeanor belies a discriminatory intent, but also whether the juror's demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor." *Snyder v. Louisiana*, 552 U.S. 472, 477 (2008) (noting that where the trial court failed to make any factual finding as to demeanor in denying a *Batson* challenge, the prosecution's assertion that a juror had a concerning demeanor cannot be deemed credited).

Here, the trial court failed to evaluate and make factual findings regarding the prosecutor's proffered explanations for the four challenged strikes of Black jurors, and thus unreasonably applied *Batson.* After the first *Batson* challenge, the trial court noted that he observed "no established pattern at this time" but invited the prosecutor to state his reasons for the strike if he wished to do so. ROA.6237:5-15. The prosecutor offered his reason for the strike;[4] however the judge made no evaluation of this reason but simply said "All right" and went on to the next juror. ROA.6237:19.

Regarding the next *Batson* challenge, as to Pauline Lewis, the trial court again engaged in no evaluation of the prosecutor's purported strike reason, simply stating, "All right; I'm going to accept the State's statement as to their reasons. I have not found that there's any particular pattern been established at this time either . . . ."

---

[4] "We made an objection to this juror for cause, and I believe that the record will support it." ROA.6237:16-18.

ROA.6239:13-16. Trial counsel had pointed out that one of the state's reasons for the strike—that Juror Lewis had a teenage child—applied to three white jurors accepted by the state, whom trial counsel listed out for the trial court as part of his *Batson* objection. ROA.6239:2-8. When the State accepted a fourth white juror with teenage children, defense counsel added her to the group of jurors who were similarly situated to Ms. Lewis. ROA.6240:10-13. And defense counsel made sure that the record clearly indicated that these four comparative jurors were white. ROA.6240:18-24.

In response the prosecutor alleged that the white jurors had responded in a manner that had "allayed whatever concerns the State had" but alleged that "[t]he demeanor exhibited by Ms. Lewis did not satisfy that. ROA.6239:9-12. The prosecutor did not specify what he meant by Ms. Lewis' demeanor, and the voir dire transcript reveals that Ms. Lewis and the multiple seated white jurors who responded in the affirmative to defense counsel's question of whether they had teenage or older daughters all responded simply by nodding or raising their hands. ROA.5958:7-5960:27. Thus, there was no "difference in demeanor" to distinguish Ms. Lewis from the white jurors with teenage daughters who had been accepted by the prosecution.

For the next *Batson* challenge (Willie Harper), the trial court supplied a strike explanation for the prosecutor, ROA.6244:7-19, and as to the last *Batson* challenge

(Lewis Burke), the trial court once again simply stated in response to the prosecution's proffer, "I'll accept that as a reason." ROA.6245:8-9. The Mississippi Supreme Court joined the trial court in crediting the prosecutor's reasons without analysis and endorsed the failure to move to step three of *Batson* on appeal. *Walker I*, 671 So.2d at 629.

The trial court and Mississippi Supreme Courts abdicated the Supreme Court-mandated responsibility articulated by *Batson*, *Hernandez,* and *Purkett,* by accepting the prosecutor's statements as to his reasons without evaluating those reasons or making findings on the record, and without proceeding to step three of *Batson*.

> ### 2. The state courts failed to comply with <u>Batson</u>'s requirement to consider all relevant circumstances that bear on the issue of racial animus in evaluating a Batson challenge and ignored evidence of racially disparate treatment by the prosecutor.

The United States Supreme Court has repeatedly held that, "in considering a *Batson* objection, or in reviewing a ruling claimed to be *Batson* error, all of the circumstances that bear upon the issue of racial animosity must be consulted." *Miller–El v. Dretke,* 545 U.S. 231, 239 (2005); *Batson*, 476 U.S. at 96.

As a subpart of this requirement, the Supreme Court has required courts to consider all evidence that may bear on whether a prosecutors' proffered reasons are pretextual. *Miller–El v. Dretke*, 545 U.S. at 251-52 ("[T]he rule in *Batson* . . .

requires the judge to assess the plausibility of that reason in light of all evidence with a bearing on it."). In particular, evidence that the prosecutor engaged in racially disparate treatment of similarly situated jurors must be consulted. *Id.* at 241. Where courts have failed to consider that white jurors accepted by the prosecutor shared the same characteristic noted by the prosecutor as the reason for their strike of a Black juror, the Supreme Court has reversed. *Miller-El,* 545 U.S. at 241 ("If a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step."). Such disparate treatment by a prosecutor of jurors possessing a characteristic of purported importance to the prosecutor does not only weigh against the validity of the strike rationale proffered; it also reveals calculated pretext and is, in and of itself, evidence sufficient to prove racial discrimination. *Snyder*, 552 U.S. at 478 (holding that "prosecutor's explanation given for the strike of Mr. Brooks is by itself unconvincing and suffices for the determination that there was *Batson* error").

Relevant evidence that courts must consider also includes whether the prosecutors asked any questions regarding the characteristics that they claim to have based strikes on. *Reed v. Quarterman*, 555 F.3d 364, 377 (5th Cir. 2009). "As the Supreme Court stated, the prosecution's failure to question a potential juror about a characteristic that the State asserts is important evidence that the asserted reason was

actually a pretext for discrimination." *Id.* "[T]he State's failure to engage in any meaningful voir dire examination on a subject the State alleges it is concerned about is evidence suggesting that the explanation is a sham and a pretext for discrimination." *Miller-El v. Dretke,* 545 U.S. at 246 (quoting *Ex parte Travis,* 776 So.2d 874, 881 (Ala. 2000)).

### a. Pauline Lewis

Here, the trial court and the Mississippi Supreme Court failed to give any consideration to the evidence that the characteristic on which prosecution claimed to have based its strike of Black juror Pauline Lewis was shared by white jurors who the prosecution had already accepted—all but one of whom were seated on the jury. Further, the courts failed to consider the fact that the prosecution had asked zero questions of Ms. Lewis or the similarly situated white jurors regarding this characteristic that was supposedly important enough to form the basis of a peremptory challenge. This evidence of disparate treatment by the prosecution, ignored by the courts, both reveals the prosecution's purported reasons for striking Ms. Lewis to be pretextual and provides evidence of intentional racial discrimination in the prosecution's elimination of Ms. Lewis from the jury.

When asked by the trial court what his reasons were for striking Pauline Lewis, the prosecutor responded, "She had a teenage daughter, in response to a question that the defense asked; and the manner in which she responded to questions,

I felt like she was dealing with some problems that we weren't able to reach. That perhaps would have been the basis of it." ROA.6238:25-6239:1. Defense counsel quickly pointed out that the prosecutor had chosen not to strike five white jurors, Sylvia Foster, Elaine Watkins, Don Thompson, McDavid Shows, and Frances Nobles who each also had teenage daughters. ROA.6239:2-8 (Foster, Watkins, Thompson, and Shows); ROA.6240:10-13 (Nobles). Four of these white jurors, Ms. Foster, Ms. Watkins, Mr. Shows, and Ms. Nobles were seated on the jury.[5] ROA.6254:2-28. The prosecutor responded, "All of whom responded in a manner that allayed whatever concerns the state had. The demeanor exhibited by Ms. Lewis did not satisfy that." ROA.6239:9-12.

However, the record reveals the prosecutor's explanation for his strike of Ms. Lewis to be false. The responses given by the white jurors having teenaged or older daughters and by Pauline Lewis are indistinguishable. The transcript makes clear that none of these jurors gave any answer of substance when defense counsel posed the question to the entire venire, "how many of you have a daughter who is at least of teenage years or older?" ROA.5958:7-5960:27. Jurors responded by putting their hands up as defense counsel went panel by panel down the lines of jurors, confirming with each juror whose hand was up.

---

[5] Don Thompson, although accepted by the prosecution, ROA.6237:26-27, was struck by the defense. ROA.6245:28-6246:1.

When it was her turn to respond to defense counsel's question, Ms. Lewis clarified "Did you say teenager or older?" and then raised her hand upon defense counsel confirming "teenager or older."ROA.5959:9-12. Likewise, when it was her turn Ms. Foster responded to defense counsel by nodding her head. ROA.5958:16-17. Ms. Watkins also responded only with a nod of her head. ROA.5958:24-25. Mr. Thompson replied "Right" when defense counsel, said "Mr. Thompson you had one, too?" ROA.5959:26-28. Mr. Shows responded "I've got three of them" when defense counsel said "I passed you up, Mr. Shows. I'm sorry. You've got a daughter?" ROA.5959:13-15. Frances Nobles similarly put her hand up and appears to have clarified "They're older" when defense counsel came to her row and asked "Ms. Nobles and Ms. Bass; is that right? You have a daughter that's teenage years? Did you have your hand up for that reason?" ROA.5959:21-25.[6]

These were the only responses given by the jurors in response to the questioning about having teenage children. Nothing about these responses is substantively distinguishable from the response given by Pauline Lewis. The fact that the prosecutor claimed there was a distinction in these responses and offered

---

[6] The transcript labels this response as coming from "prospective juror," but the context makes clear that it was either Ms. Bass or Ms. Nobles who responded to defense counsel's question by saying "they're older." If indeed this was Ms. Bass and not Ms. Nobles, then Ms. Nobles only response was to raise her hand as noted by the transcript entry, "(Hands up)." ROA.5959:21-25.

that as a basis for his decision to strike Ms. Lewis is a blatant façade, and evidence of pretext.

As the Supreme Court indicated in *Snyder*, a prosecutor's claim that a juror had a concerning demeanor cannot be credited on appeal where the trial court made no factual finding as to this explanation. *Snyder* at 479, 485.

Later in the voir dire, during questioning specifically about jurors' views on the death penalty, the prosecutor had the opportunity to ask follow-up questions of Ms. Lewis. He did not direct a single question to Ms. Lewis other than asking her generally whether she could be fair and follow the law:

> THE COURT: Does the State have any questions?
>
> VOIR DIRE EXAMINATION BY MR. CARANNA
>
> MR. CARANNA: Do you think you could be a fair juror for both sides in this case?
>
> MS. LEWIS: I beg your pardon?
>
> MR. CARANNA: Do you think you could be a fair juror for both sides in this case?
>
> MS. LEWIS: I think so, yes.
>
> MR. CARANNA: And decide the case based on the evidence --
>
> MS. LEWIS: Evidence.
>
> MR. CARANNA: -- and the law that you hear here?
>
> MS. LEWIS: Right.
>
> MR. CARANNA: Thank you, ma'am.

 ROA.6031:17-6032:3.

This colloquy was the only time during voir dire that the prosecutor had dialogue with Ms. Lewis. These responses reveal no sign of reticence, nervousness, lack of communicativeness, failure to understand questions, or any other kind of unique demeanor. The record is devoid of any support for the prosecutor's claim that he was concerned with Ms. Lewis' demeanor and "the manner in which she responded to questions."

Furthermore, the prosecutor, despite claiming to be wary of the characteristic of having teenaged children, failed to ask a single question to **any** of these jurors regarding them being parents of teenage children. It is impossible to imagine how any of the white jurors could have allayed the prosecutor's alleged concern regarding their status as parents of teenaged daughters with their nonverbal or one sentence affirmations that they had daughters, while Ms. Lewis identical act of raising her hand did not.

Additionally, neither state court considered juror Lewis' answers on her questionnaire, which suggested that she would be favorable to the State. On her questionnaire, Ms. Lewis answered that if someone kills, he should get the death penalty. ROA.6030:20-24. Under questioning, she modified her stance to indicate that she would not automatically vote for the death penalty in all cases, stating she did not think a person should be sentenced to death in every case where he was convicted of capital murder, that she would base her decision on the evidence and

testimony and follow the law given by the court, and that she could vote for life. ROA.6030:28-6031:14. The trial court and state supreme court also failed to consider that juror Lewis had a relative with connections to law enforcement, which is another factor that should have made her seem favorable to the State. ROA.5925:25-28 (question to panel); ROA.5926:7-15 (answer from Ms. Lewis).

The trial court and the Mississippi Supreme Court failed to (1) evaluate the prosecutor's proffered reasons for striking Ms. Lewis and move to step three of *Batson*, and (2) consider the evidence bearing on the question of racial discrimination, including: (a) the comparative analysis asserted by defense counsel that the prosecutor's purported reason for striking Ms. Lewis applied equally to white jurors accepted by the prosecutor, (b) the additional evidence in the record impeaching the sincerity of prosecutor's characterization of Ms. Lewis' responses to be demonstrably untruthful, including (i) the paucity of his questioning of her and (ii) the fact that her responses were substantively identical to those from white jurors accepted by the prosecutor. This series of failures by the state courts amounts to a refusal to follow the clear mandate of the United States Supreme Court.

Neither the trial court nor the Mississippi Supreme Court conducted the sensitive factual inquiry demanded under clearly established law. *See Pitchford,* at *5-6 (noting responsibility of court to assess the prosecutor's race-neutral reason for striking a juror is pretextual in light of all evidence with a bearing on it) (cite

31

omitted); *see also McGahee v. Alabama Dep't of Corr.,* 560 F.3d 1252, 1263-65 (11th Cir. 2009) (failure of trial court to make ruling after prosecutor gives specific reasons and failure of state court of appeals involved an unreasonable application of clearly established law; also, appellate court "did not review any of the evidence from the record to make that determination"). Where, as here, the state courts "seemed to assume that a race-neutral explanation (*Batson's* step two) was decisive and sufficient," then there has been an unreasonable application of *Batson. Dolphy v. Mantello,* 552 F.3d 236, 239 (2nd Cir. 2009).

### b. Willie Harper

Recall that the trial court supplied a race-neutral reason for the peremptory challenge of Ms. Harper even before the prosecutor did so: "I will certainly take note of the fact that there was substantial reason for striking that juror no matter what her race would be . . . . because of her chickens and her pigs and her children." ROA.6244:9-12.

The strike of Willie Harper was justified by the Mississippi Supreme Court on grounds that "[e]mployment and factors related thereto have also been accepted by various courts as race-neutral reasons for a peremptory challenge." *Walker I*, 671 So.2d at 628 (citing *Lockett v. State*, 517 So.2d at 1352). But the voir dire of Ms. Harper, quoted at length below, established only that she had animals and a garden at home, and claimed that her 23-year-old daughter, who worked regular hours,

would not be able to take care of them.

> THE COURT: All right. Ms. Harper, during the question and answer session that we had, you indicated that as far as the sequestering was concerned, the saying overnight, that you would have a problem with that because of family obligations; is that correct?
>
> MS. HARPER: Right.
>
> THE COURT: What – what are those obligations? Are you a single parent; is that what it is?
>
> MS. HARPER: Yes, sir.
>
> THE COURT: How old are your children?
>
> MS. HARPER: I have one daughter.
>
> THE COURT: One daughter?
>
> MS. HARPER: She's 23, but it's just the two of us at home.
>
> THE COURT: I see.

ROA.5973:14-5974:1.

> THE COURT: Okay. Your daughter that's at home there with you, she doesn't suffer from any disabilities of any kind that you have to look after her, does she?
>
> MS. HARPER: She's full of health just like I am. The only thing is her being alone.

ROA.5975:17-22.

> MR. CARANNA: Just a – ma'am, do you realize that you would not be able to go home any at all between now and maybe as long as next Wednesday?
>
> MS. HARPER: I realize that.

MR. CARANNA: Okay. And you would be able to stay here during that period of time and concentrate on this case?

MS. HARPER: No, I'm not saying that I would be able to stay here. I mean, I don't see no way possible right now, because I don't have anyone there to take care of anything.

THE COURT: Well, that's what I was trying to ask you a while ago and give you the opportunity to tell me –

MS. HARPER: Well, I'm sorry. I was just ignorant to understand. [Sic]

MR. CARANNA: You would have to stay here, be put up at a hotel and stay here.

MS. HARPER: I understand then.

MR. CARANNA: Could you do that?

MS. HARPER: I couldn't. I don't know of anyone I could get to take care of what I have to take care of around home and stuff like that and be with my daughter.

MR. CARANNA: Is that a farm or –

MS. HARPER: Well, I guess you could call it – hogs, chickens, ducks.

MR. CARANNA: Okay.

MS. HARPER: Garden.

ROA.5975.28-5976:27.

MR. STEGALL: Yes, sir. Your daughter is how old?

MS. HARPER: Twenty-three.

MR. STEGALL: She's grown and you feel like you need to be there with her?

34

MS. HARPER: My daughter got her own job, sir, and she have her own things, you know, and just me being her parent. I'm her guardian. You understand me?

ROA.5977:9-17.

MR. STEGALL: She can't feed those things?

MS. HARPER: She doesn't have time. She have her occupation on her job, just like I have my duties to do.

MR. STEGALL: Do you have another job besides those things?

MS. HARPER: I work for Dr. Dare.

MR. STEGALL: What's your hours?

MS. HARPER: 8:00 to 4:00, sometimes 4:30 to 5:00.

MR. STEGALL: What's her hours?

MS. HARPER: My daughter?

MR. STEGALL: Uh-huh.

MS. HARPER: 8:00 to 5:30.

MR. STEGALL: So she gets in well before dark?

MS. HARPER: Sometimes 6:30.

ROA.5977:22-5978:9.

In essence, then, the trial court permitted the prosecutor to strike Ms. Harper, not because of her occupation, but because of her home "garden," (in her words), even though her adult daughter could have been tasked to tend to that pastime. And the Mississippi Supreme Court, using a checklist it had earlier offered in the appendix in the *Lockett* case, accepted this farce.

35

**D. This Court should grant a certificate of appealability on the <u>Batson</u> claim regarding prospective jurors Lewis and Harper.**

As this Court knows, a certificate of appealability should be granted where the petitioner shows "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell*, 537 U.S. 322, 337 (2003) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) and *Barefoot v. Estelle*, 463 U.S. 880, 883 n.4 (1983)). *See also Ramey v. Davis*, 942 F.3d 241, 250-54 (5th Cir. 2019) (granting COA on *Batson* issue); *Reed v. Quarterman*, 555 F.3d 364 (5th Cir. 2009) (same); *Rosales v. Dretke*, 133 Fed.Appx. 135 (5th Cir. 2005) (COA granted on viability of procedural default on *Batson* claim). And as this Court also knows, the Mississippi Supreme Court's credibility on *Batson* issues has been questioned repeatedly by the Supreme Court. *Pitchford v. Cain*, No. 24-7351, 608 U.S. ----, 2026 WL 1485608 (May 28, 2026); *Flowers v. Mississippi*, 588 U.S. 284 (2019).

Walker has at a minimum made a substantial showing of the denial of a constitutional right with respect to his *Batson* claims, and reasonable jurists could disagree with the district court's resolution of those claims. Indeed, the Supreme Court has repeatedly emphasized that *Batson* claims require a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available," *Batson*, 476 U.S. at 93, and that courts must conduct a meaningful comparative juror analysis

36

when evaluating whether the State's purportedly race-neutral reasons are credible. *Miller-El v. Dretke*, 545 U.S. at 241; *Flowers v. Mississippi*, 588 U.S. 284, 302-03 (2019).

Here, reasonable jurists could debate whether the district court meaningfully engaged with the comparative juror evidence and whether the State's explanations for striking Black venirepersons were genuinely race-neutral when viewed against the totality of the voir dire record.

## II.   THE COURT SHOULD GRANT A COA TO CONSIDER COUNSEL'S UNREASONABLE EXPECTATION OF A PLEA BARGAIN AND FAILURE TO DEVELOP AND PRESENT MITIGATING EVIDENCE

According to the district court, no mitigation evidence could have persuaded one of the jurors that the facts of Konya Edwards' murder need not be punished by death. But it is precisely the extremity of the assault and killing of Ms. Edwards that begs the question, "who would do this?" and "why would anyone do this?" As post-conviction expert Dr. Matthew Mendel[7] put it, "to a large degree, the question came down to, where does Alan Walker's rage, and rage at women in particular, come from?" ROA.4935.

Earl Stegall, Walker's trial attorney, could not provide the jury with an answer to those questions because he had made no effort to find one. Despite Stegall

---

[7] Much of Dr. Mendel's work has been with adult men who were sexually abused in their childhoods. ROA.4920-21.

asserting that his sentencing phase strategy in death penalty cases was to "humanize" his client, he did not look for any evidence on which such a strategy could be built.

Defense counsel's failure to do any investigation in preparation for the penalty phase prevented the jury from hearing about the poverty, neglect, and sexual exploitation that Walker was exposed to as a child. Walker spent his childhood being surrounded by sexual abuse of young women, and exposed to sexual abuse himself, relating directly to his crime. But his trial lawyer's failure to do any mitigation investigation prevented the jurors from learning about this much needed context, without which they could not fully evaluate whether he should receive a life sentence.

The state court unreasonably concluded that trial attorney Earl Stegall's complete failure to investigate Walker's life history or even interview any members of his family until the weekend before trial was a valid application of a strategy of "humanizing" his client. And the district court erroneously held that this failure did not prejudice Walker. This Court should grant a certificate of appealability to review Walker's claim that there is a reasonable probability that, but for Stegall's deficient performance, at least one juror would have struck a different balance.

**A. Counsel admittedly did not prepare for the penalty phase.**

*1. Facts from trial and the PCR hearing.*

Earl Stegall, Walker's trial counsel, did nothing to prepare for the penalty phase until the weekend before trial when he learned that Jason Riser, the co-indictee, reached an agreement with the State to testify against Walker. At that point, Stegall was already in Vicksburg due to a change of venue from Harrison County. Until then, Stegall had believed that Riser was not going to testify. ROA.4897-98. As Stegall testified, "I thought for sure that I would be offered a plea offer for him so that he would, at worst, receive, you know, a life sentence rather than facing the death penalty." ROA.4899. Stegall believed that even without a plea offer, he had a chance to prevail at the guilt phase with a defense that Riser was the actual killer. ROA.4900.

As Stegall described it, after having Walker's confession suppressed, he thought he "had a lock on the life sentence" and "wasn't as worried about the penalty phase at all at that point." Stegall acknowledged that he had no strategic reason for not developing mitigation evidence and was simply hoping to receive a plea offer. ROA.4906. When he learned that Riser would testify,[8] Stegall filed a hand-written motion for a continuance the day the trial began. ROA.4899; ROA.5833; ROA.5118. This motion was denied.

---

[8] Riser pled just before Walker's trial began. ROA.5828.

Stegall failed to perform investigation for the penalty phase. At the evidentiary hearing, Stegall testified that he had no recollection of conducting mitigation investigation. ROA.4900-01. He added that it was unlikely he visited Walker's mother at her home before trial began. ROA.4900-01. Moreover, he had no recollection of speaking with family in Alaska or Florida, including Walker's father, who did not even know the trial was happening. ROA.4900-01; ROA.4774-75.

The witnesses at the evidentiary hearing corroborated Stegall's testimony that he had failed to investigate. Stegall had no contact with Alan's father, Ronald, Alan's brother, Terry, or his aunt, Nellie Richards, and they all would have testified at trial had they been asked. ROA.4792; 4815-16, 4839-40. Though Alan's mother, Anita, and sister, Amanda, testified at the penalty phase, both testified at the hearing that neither Stegall nor his co-counsel Robin Midcalf spoke to them before they arrived in Vicksburg for the trial. ROA.4714-15, 4754-55.[9]

In addition to failing to interview Walker's family in advance of trial, Stegall conducted no other means of investigation to prepare to argue for Walker's life at the penalty phase. While there was a competency evaluation, Stegall confessed that this was not for the purpose of mitigation investigation and did not result in any

---

[9] Alan's brother Leon insisted that he did not testify at the trial even though he clearly did. ROA.4863-65.

mitigating evidence. At the post-conviction hearing, Stegall did not remember asking for a competency evaluation. ROA.4913. However, he sought a competency evaluation on July 26, 1991, with the trial scheduled to begin barely a week later, on August 5, 1991. Stegall admitted that the request for the competency evaluation was made solely to protect himself from a collateral challenge. ROA.4874, 4912-13. Dr. Maggio saw Walker on July 30, 1991, for a brief evaluation limited to an assessment of competence and sanity. Although not recalling specifics about the evaluation, Stegall was confident that any conversation he had with Dr. Maggio would only have been about competency, and not mitigation. ROA.4914.

After Walker's inevitable conviction, Stegall could do nothing for the penalty phase but call the four witnesses who were handy. The first was Mike Maniscalco, a project superintendent for Tilley Constructors. ROA.6933. Maniscalco had known Walker for about a year because Walker worked on a project as a general laborer. Maniscalco characterized him as punctual and well-liked by others. ROA.6936. On cross-examination, however, Maniscalco testified that he would not hire him knowing about the convictions. ROA.6937.

Alan's half-brother Leon was called to testify, but he could only provide the most elementary facts, and he struggled to recall details of those. ROA.6938-42. Leon testified to where Anita worked and that Alan often looked after him when she worked. ROA.6945. When asked if he had anything to add, Leon said Alan should

get a life sentence because that was Riser's sentence, and Alan has a 16-month-old baby to worry about. ROA.6947. The prosecutor did not cross-examine Leon.

Amanda, Alan's young sister, was the next mitigation witness. After repeating some of the information from Leon's testimony, she testified that Alan was good to her and took her places. She added that Alan cared about his daughter. ROA.6952.

Finally, Stegall called Anita, Alan's mother. Like Leon, she was asked to provide little more than basic facts. Anita recounted superficial details from Alan's life, beginning with his birth in Florida and the move to Mississippi. She said nothing about her own upbringing. ROA.6955-57. She also mentioned the times that Alan and his brother Terry went to stay with their father in Alaska. ROA.6962. Defense counsel asked her about various things such as who else lived with the family, and where Alan worked and lived. ROA.6963-70. Stegall introduced a picture of Alan's daughter into evidence and elicited testimony from Anita that Alan loved and cared for her. ROA.6973.

Anita also testified about when Alan received a certificate of appreciation for going into a burning house to save a baby. ROA.6974-75. At the conclusion of the testimony, Stegall asked Anita if she had anything to add and she said that he should receive the same punishment as Riser. ROA.6978.

As discussed *infra* at Section C, this barebones testimony did not even begin to traverse the substantial mitigation evidence that exists regarding Alan Walker's

upbringing, and the serious and disturbing abuse that he was exposed to during his childhood.

The bankruptcy of the mitigation Stegall presented at trial was particularly evident in closing arguments. Stegall essentially conceded the absence of mitigation other than Walker's lack of a criminal record. ROA.7022. With respect to whether the defendant had been under the influence of extreme mental or emotional disturbance, defense counsel admitted, "there's nothing like that in evidence at all." ROA.7023.

Stegall diminished the little mitigation he presented. Stegall mentioned that Walker came from a broken home but then said: "that doesn't explain or really excuse anything because lots of people go through broken homes." ROA.7023. A short time later, he again diminished the value of the minimal evidence he presented: "He lived kind of a hard life, but a lot of people do that; and that again does not explain why in the world something like this would happen." ROA.7024.

Stegall's co-counsel, Robin Midcalf, also addressed the jury but did little more than beg for her client's life, stating that "there has to be something good in him." ROA.7039. She also urged the jury to spare his life so that he would be able to think about what he did. ROA.7038.

The prosecutor emphasized the lack of evidence for any of the statutory mitigating circumstances and asserted that there may have been some evidence that

Walker may have taken care of some girlfriends but not much more. ROA.7044, 7046.

### 2. The post-conviction court relied on the competency evaluation which had never been introduced at the hearing; and then denied Walker a chance to respond to the report.

Following the evidentiary hearing, the circuit court discovered the report of Dr. Maggio's competency evaluation under seal in the Circuit Clerk's files. Walker had relied on other portions of the trial record in questioning trial counsel, and the State did not produce the report at the hearing. When the lower court indicated that it found the report relevant, Walker asserted the court should re-open the evidentiary hearing. ROA.4406.

The court, however, denied the request for a hearing. It found Stegall "would not be able to offer anything beyond his original testimony that would assist the Court in deciding the remand issue." ROA.4409. It also found additional testimony from Dr. Mendel and Dr. Shaffer would not assist it in deciding whether trial counsel was ineffective.

In a Corrected Order, the lower court relied greatly on the Maggio report in finding trial counsel's performance not deficient. ROA.4531.

In a Motion to Alter or Amend, Walker attached affidavits from Thomas Fortner and Ross Parker Simons, experienced lawyers familiar with the standard of care in capital cases in Mississippi around the time of Walker's trial. Those attorneys

addressed trial counsel's timing in seeking a competency evaluation, the purpose of the request, and information in the report that would have prompted reasonably competent counsel to investigate further or seek expert assistance. ROA.4555-64. Again, Walker asked for the evidentiary hearing to be re-opened. ROA.4553. In his reply, Walker noted that State made certain factual assertions (without supporting affidavits) regarding the "normal practice" in capital litigation. ROA.4576-77. Again, Walker asked for an evidentiary hearing. ROA.4590. The lower court denied the motion. ROA.4592.

### 3. Stegall was disbarred for failing his clients.

Stegall's dereliction of duty toward Walker was not isolated. During this period, he neglected other clients, which resulted in him losing his law license. In 1993, Stegall was disbarred for failing to take any action on behalf of two clients who retained him to pursue post-conviction relief. *Stegall v. Mississippi Bar*, 618 So. 2d 1291 (Miss. 1993). A third former client sued Stegall for malpractice, again alleging that Stegall did not work on his case after accepting and keeping a retainer. This client also asserted that "Stegall has misled him, misrepresented what he was doing, and downright lied." *Singleton v. Stegall*, 580 So. 2d 1242, 1246 (Miss. 1993). Stegall was also convicted of embezzlement.

**B. The state court finding that trial counsel's performance was adequate involved an unreasonable application of clearly established law or unreasonable findings of fact.**

In a capital case, counsel has an "obligation to conduct a thorough investigation of the defendant's background." *Williams v. Taylor,* 529 U.S. 362, 396 (2000) (citing 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2nd ed. 1980)); *Porter v. McCollum,* 558 U.S. 30, 39 (2009); *Wiggins v. Smith*, 539 U.S. 510 (2003). In particular, counsel should be alert to red flags, such as poverty, dysfunctional families, or substance abuse, found in records or arising from an investigation. *See Porter,* 558 U.S. at 40 (counsel ineffective for ignoring "pertinent avenues for investigation of which he should have been aware").

Even though counsel's failures fell well below any objective measure of reasonableness, a federal court must find that the state court's adjudication of that point was based on an unreasonable application of clearly established law and an unreasonable determination of facts based on the state court record. 28 U.S.C. § 2254(d)(1) and (2); *Williams v. Taylor,* 529 U.S. 362 (2000).

Deciding whether [the] state court's decision 'involved' an unreasonable application of federal law or 'was based on' an unreasonable determination of fact requires the federal habeas court to 'train its attention on the particular reasons—both legal and factual—why state courts rejected [the] state prisoner's federal claims.'" *Wilson v. Sellers*, 584 U.S. 122, 123 (2018). The federal habeas court

"reviews the specific reasons given by the state court," *Id*. at 1192, and should not "imagine what might have been the state court's supportive reasoning," *Id*. at 1195. A federal court may not apply deference to the many reasons the state court did not use. *Rompilla v. Beard*, 545 U.S. 374, 390 (2005).

The Mississippi Supreme Court found trial counsel's performance acceptable for several reasons. First, it credited Stegall's testimony that his "strategy was to humanize his client" and deemed such a strategy "reasonable." *Walker IV,* 303 So. 3d at 727. The state court then relied on this alleged strategy to distinguish Stegall's performance from the performance of the trial attorney in *Andrus v. Texas,* 590 U.S. 806 (2020), because in *Andrus,* defense counsel "did not simply fail to investigate – he overlooked 'vast tranches of mitigating evidence' that were readily apparent to him.'" *Walker IV*, 303 So. 3d at 728 (quoting *Andrus*, 590 U.S. at 814).

Second, the Mississippi Supreme Court suggested that Walker failed to carry his burden of showing Stegall failed to investigate. *Walker IV*, 303 So. 3d at 728. According to the state court, "Walker appears to argue that Stegall's inability to remember interviewing witnesses means that he did not perform such interviews, but Stegall's inability to remember is at best a nullity." *Id.* It asserted that Stegall's "inability to remember does not weigh in favor of a finding of ineffectiveness." *Id.* The state court did not actually find that Stegall failed to undertake a meaningful pretrial investigation, noting the testimony of Walker's mother and sister that Stegall

did not speak to them before trial. *Id.* Incongruously, the state court found that "their testimony alone does not undermine the trial court's finding that Stegall's personalization strategy was an acceptable trial strategy." *Id.*

Third, the Mississippi Supreme Court relied on the lower court's finding that "Dr. Maggio's report provided reasonable grounds for counsel to forego additional psychological testing before sentencing. *Id.* The state supreme court also upheld the trial court's refusal to reopen the hearing to allow Walker to challenge its reliance on Dr. Maggio's competency evaluation even though the State did not mention the contents of that report at the hearing.

The Mississippi Supreme Court adjudication of the performance prong was unreasonable because it failed to account for Stegall's admission that he did not do any preparation in service of this purported strategy based on his hope for a deal. "An attorney's performance is not immunized from Sixth Amendment challenges simply by attaching to it the label of 'trial strategy.'" *Noguera v. Davis,* 4 F.3d 1020, 1042 (9th Cir. 2021). Counsel cannot devise a theory that may be reasonable in the abstract without conducting an adequate investigation making the selection of that theory reasonable. *See Sears v. Upton,* 561 U.S. 945, 953 (2010). It is not reasonable, let alone "strategic," to do no penalty phase preparation whatsoever until trial.

Stegall simply could do little else after being caught unprepared for the penalty phase. In fact, the trial court recognized Stegall did no investigation. In an

order entered with respect to the approach to handling the report of the competency evaluation by Dr. Maggio, the lower court plainly stated: "The record is clear that trial counsel did not perform a mitigation investigation or have Walker tested along the lines that have been conducted by the post-conviction expert witnesses. ROA.4410. The adoption of a "strategy" without first investigating is deficient performance.

In *Wiggins v. Smith*, 539 U.S. 510, 522-23 (2003), the Supreme Court noted that trial counsel articulated a seemingly "strategic" reason for not pursuing a detailed investigation into mitigating evidence. However, the question was not whether counsel offered a reason for the lack of investigation; instead, the Court considered whether the decision not to investigate was reasonable under prevailing professional standards. *Id.* at 523-24. Here, Stegall's last-minute efforts to cobble together a mitigation case while starting trial were unreasonable under prevailing standards. *See also Williams v. Taylor*, 529 U.S. 362, 395 (2000) (finding counsel's performance unreasonable even under review pursuant to § 2254(d) when counsel only spent the week before trial preparing for mitigation). *See also Abdul-Salaam v. Sec'y of PA Dep't of Corr.,* 89 F.3d 254, 268 (3rd Cir. 2018) (counsel cannot make strategic decision without "rudimentary background information") (quotes omitted); *Foust v. Houk,* 655 F.3d 524, 534-35 (6th Cir. 2011).

The state supreme court's attempt to distinguish *Andrus* is also unreasonable.

Stegall did less investigation that Andrus's counsel. Andrus's counsel disregarded red flags but Stegall "made very clear that he pursued a tactical decision to humanize Walker." *Walker IV,* 303 So. 3d at 728. Stegall, however, could not "disregard" any red flags knew nothing about.

As he testified, "I really expected right at the last to get that continuance when that boy [Riser] decided – you know, they worked the arrangement out to testify." ROA.4916. At that point, "I would have changed course, in a sense, to just do a shotgun approach, you know what I mean, you just try everything in the world you can think of to avoid that death sentence." ROA.4916. Stegall admitted that his plan for the penalty phase was to prevent the case from getting to that stage by obtaining a plea deal or acquittal. This unreasonable hope and failure to prepare is not a strategy, much less a reasonable strategy.

The Mississippi Supreme Court juxtaposed Stegall's memory issues with testimony from Walker's mother and sister that he did not speak to them until the trial began as "at best a nullity" and that somehow "their testimony alone does not undermine the trial court's finding that Stegall's personalization strategy was an acceptable trial strategy." *Walker IV*, 303 So. 3d at 727.

This statement, however, is clearly erroneous for several reasons. First, despite his memory problems, Stegall was clear he was not expecting to have to present a penalty phase case and thus did not do any investigation to prepare for one

prior to leaving town for trial. Second, all other witnesses, including Walker's brother, Terry and father, Ronald, testified that Stegall did not contact them. Thus, nothing in the record supports even a suggestion that Stegall performed a timely investigation. *Neal v. Vannoy*, 78 F.3d 775, 778 (5th Cir. 2023) (overcoming presumption of correctness because state court fact-finding did not consider contrary evidence).

The Mississippi Supreme Court also credited the lower court's finding that "Dr. Maggio's report provided reasonable grounds for trial counsel to forego *additional* psychological testing before sentencing." *Walker IV*, 303 So. 3d at 727 (emphasis added). This finding, too, is unreasonable. First, Stegall did not arrange for *any* psychological testing by any expert; thus, to suggest Stegall simply opted to forego more testing is contrary to the record.

Second, the evaluation was solely for the purpose of competency. Clearly established law distinguishes between an evaluation for competency and a broader evaluation for mitigation evidence. *See, e.g., Rompilla, supra; Saranchak v. Secretary, Pennsylvania Dept. of Corrections*, 802 F.3d 579, 594 (3rd Cir. 2015) (evaluation limited to competency and sanity insufficient for mitigation investigation); *Williams v. Allen,* 542 F.3d 1326 (11th Cir. 2008) (counsel deficient for relying on a competency evaluation without a social history); *Hardwick v. Secretary, Fla. Dept. of Corrections*, 803 F.3d 541, 554 (11th Cir. 2015) (counsel's

decision to have an evaluation for competency and sanity did not excuse "his failure to perform even a rudimentary amount of investigating"); *Haliym v. Mitchell*, 492 F.3d 680, 712 (6th Cir. 2007). Even Stegall was clear in his testimony that he understood the difference between a competency evaluation and an evaluation for other purposes.  ROA.4912.

Third, the state court unreasonably overlooked Stegall's admission that when he sought the evaluation, he did not have any concerns about Walker's competency; he made the motion simply to protect himself.

Fourth, the state court unreasonably overlooked the timing of the evaluation – just about a week before trial, when there would not have been time to follow up any leads in Dr. Maggio's report. *See Williams v. Taylor, supra* (counsel deficient for waiting too long to begin investigation)

Fifth, the state court unreasonably found that Dr. Maggio's report "found no defect of intellect, memory, or judgment in Walker." *Walker IV*, 303 So. 3d at 727. This is contrary to the record and therefore unreasonable. *Neal,* 78 F.3d at 778. Dr. Maggio noted problems with alcohol consumption and memory difficulties. *See* Sealed Exhibit. Although those observations should have alerted counsel to investigate further. *See, e.g., Rompilla*, 545 U.S. at 392 (counsel ineffective for failing follow up on "red flags" pointing to the need for further testing); *Williams v. Stirling*, 914 F.3d 302, 318-19 (4th Cir. 2019) (counsel's failure to follow up on

indications of Fetal Alcohol Syndrome fell below prevailing norms for capital representation).

As Fortner and Simons observe, Dr. Maggio's report noted significant details such as coming from a broken family, dropping out of school, heavy drinking and drug usage, and memory problems. ROA.4560, 4564. This should have led counsel to seek the type of assistance provided by Dr. Mendel and Dr. Shaffer. ROA.4560.

The Mississippi Supreme Court noted that "[a]t most, Walker's post-conviction counsel presented an alternative reasonable strategy but failed to show that Stegall's strategy was not unreasonable." *Walker IV*, 303 So. 3d at 727. Stegall, however, never actually pursued the "strategy" he talked about. As he recalled, "my thing in death penalty cases was to personalize them. Make them a person, you know. And tell their life history as well as you could so the jury could look at them and think of them as a person and not just somebody sitting there charged as a murderer." ROA.4900.

But Stegall did no investigation and was thus in no position to learn Walker's story himself, much less tell it to the jury and help the jury understand the circumstances of his upbringing that put the crime into context. Put another way, the so-called "humanization strategy" did not foreclose the need for a thorough investigation of Walker's life circumstances; rather, it demanded that investigation. The state court's finding that Stegall made a tactical decision to pursue a different

theory is contrary to the record and thus unreasonable. Furthermore, there was nothing "reasonable" about waiting until the week before trial to request the evaluation, and nothing "reasonable" about foregoing any investigation into facts which counsel could have given Dr. Maggio to inform his opinions.

The state court's refusal to re-open the hearing after the trial court's decision to rely on matters not presented at the hearing also violated Walker's due process rights, which include fair notice and an opportunity to respond. *See Gardner v. Florida*, 430 U.S. 349, 362 (1977) (a capital defendant must have the opportunity to rebut or explain evidence used against him); *Ford v. Wainwright,* 477 U.S. 399 (1986). If the adjudication of a federal claim rests on a violation of due process, then the state court's adjudication of the federal claims is unreasonable. *Panetti v. Quarterman,* 551 U.S. 930, 948 (2007) (the state court's failure to afford fair process allows review of the underlying federal claim "unencumbered by the deference AEDPA normally requires"); *see also Brumfield v. Cain*, 576 U.S. 305, 317 (2015) (state court refusal to grant evidentiary hearing was unreasonable).

The trial court's failure to allow Walker to submit testimony from trial counsel and others as to the impact of the competency evaluation, if any, on any strategy had by counsel at trial is particularly prejudicial given that the court relied on its own speculation as to how the report impacted trial counsel's strategy at trial. It is clear error to reject testimony from witnesses about the competency report, including trial

counsel himself, and then make an unsubstantiated finding as to what trial counsel's thinking after receiving that report must have been.

The trial judge reasoned that reopening of the evidentiary hearing to examine the competency report was unnecessary in large part because trial counsel "would not be able to offer anything beyond his original testimony that would assist the Court in deciding the remand issue." ROA.4409. In deciding this the trial judge pointed out that trial counsel had testified at the evidentiary hearing as to his memory problems. ROA.4409. However, counsel's memory was successfully refreshed after having the opportunity to view the items in the record that counsel asked questions about. See ROA.4901-09. Walker was never afforded the opportunity to attempt to refresh counsel's recollection by allowing him to review the report.

Indeed, counsel testified at the evidentiary hearing that though he had not had an independent memory of it, he remembered after speaking with Walker's attorneys that he had requested a competency evaluation by Dr. Maggio. ROA.4907. The State noted that the copy of the report was never put in the record, and trial counsel affirmed that any copy that he had was lost in Hurricane Katrina. ROA.4908. Despite this, trial counsel was able to testify to recall that during his capital practice at that time, he had never gotten a favorable report from Dr. Maggio: "I never got a good report . . . I mean one that was favorable to the defendant, in a capital case from Dr. Maggio, I can tell you that for sure." ROA.4908.

If presented with the actual contents of the competency report, there is no cause to think that trial counsel's memory would not be refreshed such that he could testify as to whether his failure to obtain expert witnesses at sentencing was somehow caused by the contents of the report.

Even if Stegall could not recall the contents of the report, Walker nevertheless could have presented testimony as to the professional norms in Mississippi at the time of his trial. Two experienced lawyers who handled capital cases on the Gulf Coast in the early 1990s could have testified that waiting until approximately a week before trial to seek a competency evaluation, especially when Stegall admitted there was no basis for the request other than to protect himself from a collateral challenge, fell far below the norms of professional conduct. ROA.4555-61; ROA.4562-64.

Further, by not allowing a critical examination of the competency report via an evidentiary hearing, the trial court left questions of fact unresolved as to the actual weight, if any, the competency report should be given as an excuse for the failure to investigate and present mitigation evidence. The court then provided speculative answers to those questions instead of allowing Walker to provide evidence to resolve factual questions arising from the record. Specifically, the record is unclear as to what sources of information Dr. Maggio relied on in conducting the competency evaluation, how much time he spent with Walker in forming his opinion as to competency, whether there would have been a foundation at trial for admitting his

testimony as expert testimony—especially as to issues beyond competency—and whether his competency evaluation was actually capable of addressing mental health issues beyond competency.

Walker's experts at his evidentiary hearing were questioned rigorously as to their expert credentials, the exact subject areas to which they could offer expert opinion, as well as to the sources they consulted in reaching their expert conclusions and the breadth of those conclusions. *See, e.g.*, ROA.4922-26. In contrast, because the competency report was accepted by the court without being addressed at the evidentiary hearing, Dr. Maggio's opinions were untested and the professional norms from the time of Walker's trial as to the weight and breadth with which defense attorneys considered competency evaluations in determining whether to hire an independent defense expert for mitigation purposes was left unexplored.

The trial court took it upon itself to fill this void, and rule on this question of fact without evidence. The state judge declared, "Dr. Maggio was appointed to perform a competency evaluation, but his report provided greater breadth than just opining on competence to stand trial" and made the factual finding that, after "[a] fair reading of the report . . . there would be no reason for trial counsel to develop additional psychological or psychiatric evaluations." ROA.4531. Walker did not have the opportunity to submit evidence addressing whether professional norms at the time would cause reasonable counsel to give such deference to a competency

evaluation from an expert known to be unfavorable to the defense that it obviated the need for a psychiatric evaluation as to mitigation—specifically the impact of trauma (unknown to Dr. Maggio) on Walker's brain, decision-making skills and culpability.

Because the state court's unreasonably barred Walker from responding to the circuit court's reliance on Dr. Maggio's report to support a finding that Stegall's performance was adequate, this Court should find that he satisfies § 2254(d)(1).

**C. The trial court's conclusion that there was no prejudice involved an unreasonable application of clearly established law and unreasonable fact-findings.**

After establishing counsel's deficient performance, Walker must show that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 694 (1984). A reasonable probability is a probability that is sufficient to undermine confidence in the outcome. *Id.* at 694. "Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance" *Wiggins*, 539 U.S. at 537; *Lockett v. Anderson*, 230 F.3d 695, 716 (5th Cir. 2000).

The limited evidence presented at the sentencing phase "left the jury knowing hardly anything about [Walker] other than the facts of his crimes" *Porter v. McCollum,* 558 U.S. at 33. In their summation, counsel even devalued the scant

evidence they presented. However, had counsel conducted a timely and thorough investigation, they would have uncovered a great deal about Walker's limitations, his background, the horrendous environment in which he lived, and alcoholism. Moreover, expert evaluation could have shown that the abuse Walker suffered had lasting effects in that he suffered brain impairment which hinders his ability to make decisions when faced with a novel situation or when experiencing something emotionally loaded, which impairs his ability to make reasoned judgments. In a case where the penalty phase jury was certainly asking themselves how a crime such as this could have been committed, the evidence of Walker's upbringing answers this question directly, and would have changed the jury's view on the value of his life had trial counsel uncovered and presented this vital context.

### 1. Walker suffered repeated trauma growing up neglected and unsupervised in a highly sexualized environment.

Walker called Dr. Matthew Mendel as an expert witness in psychology, and in particular the effects of the traumatizing events in Walker's childhood and adolescence on his psychological makeup at the time of the killing of Konya Edwards on September 8, 1990. As Dr. Mendel put it, "to a large degree, the question came down to, where does Alan Walker's rage, and rage at women in particular, come from?" ROA.4935.

Dr. Mendel spoke to a large number of individuals who knew Walker in

childhood and after. ROA.4928-29. He reviewed numerous witness affidavits and was present during the testimony of the lay witnesses during the February 2016 portion of the evidentiary hearing. ROA.4930-31. He consulted with Dr. Robert Shaffer, the neuropsychologist who also evaluated Walker. ROA.4931.

Dr. Mendel testified that in his opinion to a reasonable degree of psychological certainty: (1) Alan Walker experienced a wide range of traumatizing factors in his childhood; (2) these traumatizing factors impacted Walker's psychological development into adulthood, and (3) "we can only understand Alan's behavior on [September 8, 1990] by understanding and taking into account this – these multiple factors, the traumas that he experienced in childhood." ROA.4933-34.

That is not to say that Dr. Mendel testified that the events of September 8, 1990 were predetermined in some fixed way by Walker's childhood traumatizing experiences. ROA.4934-35. Rather, his testimony was that "factors in our lives, childhood events, whether those be benign and positive events, or whether those be traumatizing events, have profound impacts upon us, and lead us in certain directions." ROA.4935.

In both his report and his testimony, Dr. Mendel set forth the multitude of traumatizing factors in Walker's childhood and adolescence. ROA.4935-36; ROA.5120. The facts set out below include the lay and expert testimony adduced by

Walker at the evidentiary hearing. They are organized in terms of Dr. Mendel's testimony about the critical influences on the life of Alan Walker that would have been important for his sentencing jury to consider.

Alan Walker is the oldest of Anita Frederick's four children. Alan and Terry Walker were born during Anita's short marriage to Ronald Walker. ROA.4722. After Anita and Ronald separated, Alan was about three years and Terry was an infant. ROA.4802. Ronald moved to Alaska. Terry ultimately spent more time in Alaska with Ronald than Alan did. ROA.4819-20. Leon Frederick's father is Anita's second ex-husband, Winfred Frederick. ROA.4722. Amanda Frederick, the youngest, is the child of Michael Shavers. ROA.4722.

In the aftermath of his parents' separation and divorce, Walker's family was subject to extreme poverty and instability. ROA.4936. Anita initially stayed with her mother in Florida. Because Ronald stopped paying child support after one month, and she could not find work in Florida, Anita decided to leave the state with two strangers and ultimately settled on the Gulf Coast of Mississippi. ROA.4732.

For a period of time, Anita, Alan, and Terry were homeless. ROA.4733. Eventually, Anita found a job at Moody's Restaurant to support herself and the boys. ROA.4733. At this point, Ronald did not know where Anita and his children were, and Anita admitted that she kept him from his sons by not notifying him of their whereabouts. ROA.4734. Ronald did not learn where his family had gone until

Walker was about 6 or 7 years old. ROA.4735. Anita moved into and stayed in a neighborhood where there were no sexual boundaries, incest was common, girls were bartered, and drug abuse and criminality were common.

Walker's earliest memories capture the trauma he faced. When asked about an early memory of being scared, Walker gave a vivid account on an incident when he was five or six years old. ROA.4839-40. On this date, Walker's mother sent him to the house of a friend of hers. This woman made Alan take all of his clothes off, terrifying him. He hid under the bed. When Walker told his mother about the incident, she treated it as a joke. ROA.4839. The incident was corroborated to Dr. Mendel by Anita Frederick. ROA.4839. Anita also corroborated the incident before the court in her testimony at the evidentiary hearing, describing that when he was around kindergarten age, she had Mrs. Woodcock babysit him. For some reason, Mrs. Woodcock pulled Alan's pants off. ROA.4729-30. When Alan told her about the incident, he was scared about it. ROA.4729.

The dysfunctional sexualized power dynamics to which Walker was exposed for the entirety of his childhood were so pervasive that nearly every immediate family member in his life experienced sexual abuse or observed abuse first-hand. As children, Walker and his brother Terry watched their stepfather, Winfred Frederick, repeatedly having sex with his teenage niece (Walker's cousin), Brenda Reyer, in his truck in front of the house while married to their mother. ROA.4947. When their

mother discovered her husband having sex with his teenage niece—which she viewed simply as cheating, but is rightly seen as incestuous and even criminal sexual abuse—she tried to leave Frederick, and he responded by breaking into their home. ROA.4745.

During this same time, Brenda and her sisters—all older than Terry and Alan—would separate Terry and Alan into bedrooms and touch their genitals and use them to perform sex acts. ROA.4835-36. Terry made clear that this was "childhood rape" and was hard for him to talk about. ROA.4835. Terry testified that the sexual molestation by the Reyer sisters occurred prior to them going to Alaska when Terry was in fifth grade, and estimated that he was 11 or 12 at the time, making Alan between 13 and 14 years old. ROA.4841, 4827.

Dr. Mendel testified about other instances of sexual abuse told to him first by Walker and corroborated by his age cohorts who lived in the neighborhood. ROA.4948-52. He learned that Marie Reyer, three years older than Alan Walker, and Mary Reyer, and Alan's younger (by two years) brother Terry, engaged in sexual activity as children. ROA.4850-51. The activities included "actual attempted, possibly actually performed penile vaginal sexual intercourse." ROA.4851. Such sexual activity by prepubescent children indicates to Dr. Mendel that "at least one, if not more of them, have already had that done to them by an older individual, or at the very least, been exposed to a great deal of graphic sexual material." ROA.4851.

Given the incestuous sexual abuse that Walker and his brother witnessed their stepfather perform on their young teenage cousin, it is no mystery how the various children involved may have been exposed to such inappropriate and explicit acts.

And while Dr. Mendel noted "a considerable amount of uncertainty" about the exact nature of Walker's relationship with his mother, ROA.4857, he testified that it was clear "that there was a lack of appropriate boundaries and a sexualization of the interactions between the mother and Alan." ROA.4858.

This is the context in which Dr. Mendel analyzes the public touching of his mother's breasts (over her clothing) by Alan Walker as a kind of jocular activity. ROA.4858-59.[10] Vera Faye Breland, a friend and former work supervisor of Anita Frederick's for over 20 years, ROA.4870, testified about her observations of this behavior. She stated that she saw Alan once or twice when he came to visit his mom at work. ROA.4872. She described seeing Alan touch Anita near her breast during one occasion when he visited Anita at work. ROA.4873-74.

Physical affection and love in a non-sexual context were not modeled to Walker in his childhood and adolescence. It is significant to Dr. Mendel that Alan Walker was never hugged or given physical affection from his mother. Thus, the physical contact Walker had with females was almost exclusively sexualized.

---

[10] However, that is not to diminish the possibility, as related by Robin Saucier to Dr. Mendel, that actual sexual activity took place between mother and son. ROA.4860-61. The account told by Robin to Dr. Mendel has believable detail. ROA.4701.

ROA.4963-65.

As Dr. Mendel observed, the sexual abuse suffered by Alan and Terry was part of a larger pattern of pathological sexual relationships in the 28th Street neighborhood where he grew up. ROA.4948. Dr. Mendel's interviews uncovered a pervasive belief in the neighborhood that in addition to her sexual abuse by Winfred Frederick, Brenda Reyer was also used sexually by other of her uncles. Brenda's sister Mary learned at age 18 that her oldest "sister," Linda, was actually her mother, and the man she knew as her grandfather is possibly actually her father. ROA.4949-50.

In the same neighborhood, a child the same age as Alan, named Robin Saucier, was given at age 11 to a man in his mid-40's named Leroy Marroy. ROA.4954-56. As Alan's sister Amanda testified at a post-trial evidentiary hearing, Robin and the man lived together as husband and wife despite Robin being a child. It was known in the community that the arrangement for Robin to move in was made in return for Leroy buying Robin's parents a sump pump, washer, dryer and refrigerator. ROA.4954-56. Anita Frederick corroborated the evidence of this sexually toxic environment. ROA.4750-51. When the police or juvenile authorities came around, Leroy and Robin drove to Louisiana. ROA.4751.

Alan Walker and other children and adolescents in the neighborhood were well aware of this relationship. ROA.4955. When Alan was around 23 years old, he

and Robin developed a relationship after Robin had reached adulthood and was able to leave the man who she had been sent to. ROA.4710. Alan and Robin had a daughter who they named Michelle. ROA.4753. Michelle stayed with Anita, and Alan helped take care of her. ROA.4754.[11]

Vera Faye Breland also recalled a conversation with Anita about a neighbor who had taken an inappropriate interest in Amanda when Amanda was twelve. ROA.4876-77. This neighbor bought Amanda a pair of bikinis. ROA.4876-77. She stated that Anita did not seem worried or feel threatened about it. ROA.4877. Faye stated that Anita was made aware that the neighbor was guilty of peeping in her window, although Anita, herself, did not see it. ROA4878-79.

In his adolescence, between ages 14 and 17, Alan was encouraged to smoke cigarettes, drink alcohol, and use marijuana by the group of older men who were his only physically present male role models. ROA.4965-66. He was drinking heavily with his friends and their fathers. ROA.4966. Of his four teenage friends, Alan is the only survivor into adulthood; two of his peers died from liver diseases, and one was killed in a drunk driving accident. ROA.4967-68.

Alan Walker was generally a passive individual who shunned confrontation –

---

[11] Similarly, Walker's sister Amanda, was allowed to be in a relationship with Merlin Castleberry, when he was 21 and Amanda was 13, in exchange for Castleberry purchasing goods for Alan and Amanda's mother Anita Frederick and performing services such as fixing Anita's car. ROA.4955-56.

to use his brother's term, a "chickens—t." ROA.4967. But when intoxicated, Walker would become belligerent, start fights, and in particular be aggressive towards females. ROA.4967.

Dr. Mendel then testified to the effect of these childhood traumatizing factors and immersion in this boundaryless, sexually charged environment on Walker's development. ROA.4956-57.

Moreover, the issues of powerlessness, helplessness and control are central to Alan Walker's adult psychological makeup. ROA.4969-70. Dr. Mendel testified that these issues begin back with the poverty and helplessness that Alan experienced in early childhood, from his mother's inability to establish a stable home with parental support, control and nourishment. ROA4970-71. This evoked "feelings of lack of safety, and a sense of danger and fear." ROA.4970.

This explains why the incident when six-year-old Alan was forced to strip for his mother's friend is so embedded in his memory – it was "an experience of ultimate powerlessness where he is rendered naked and helpless and terrified." ROA.4970. 348. Years later in his youth Alan was sexually used by the older girls in the Reyer family. These early sexual experiences were grounded in relationships of domination and power – the older, more powerful females over Alan and Terry, the older men in his world over their younger sexual victims. ROA.4970.

These experiences developed in Alan Walker an insecure sense of attachment,

a lack of trust that physical affection could be obtained except by sexual contact, and a fear of loss of affection and support. Thus, as Dr. Mendel explains, "There is an ultimate portrayal of power, dominance, control, versus helplessness. And that's the way sexual relation began for him." ROA.4971.

This dynamic provides a large part of the answer to the question Dr. Mendel posed early in his testimony, "where does Alan's anger arise from?" ROA.4972. Dr. Mendel testified:

> I believe that the premature introduction into sexual relationships, the sense of powerlessness and helplessness he experienced, plays a central pivotal role in his anger and rage and in understanding why it's directly solely, or virtually solely at women.

ROA.4973. He explained further:

> This is not only about rage and anger, and that can't, like the other factors, can't be understood in isolation. A big piece of that is that Alan has a profoundly distorted view of women and of relationships between men and women, which . . . creates this enormous internal conflict, and as they set up for disappointment, frustration, rage, acting out behaviors, what this core conflict is, this is not something that Alan is alone in experiencing.

ROA.4974.

Dr. Mendel also pointed to the effect of alcohol and drug abuse in reducing Walker's inhibitions and increasing his rage. ROA.4977.

In the face of the distortions shaped by these early experiences, however, Dr. Mendel pointed to Walker's ability to show concern and protection for his brothers,

his sister and (from prison) his relationship with his daughter. ROA.4977-78. In the single-gender segregation of prison, Dr. Mendel believes that Walker has, and can continue to, develop control of his negative behaviors. ROA.4978.

### 2. Without adequate supervision, Walker came under the malign influence of older men in his neighborhood.

,A continuing feature of Walker's childhood, from the time of his parents' divorce forward (with the possible exception of the limited time he spent with his father in Alaska), was a lack of parental supervision and oversight. Even after his mother found a settled location to live, found work, and remarried, Walker had to look after his younger siblings because his mother had to work two-three jobs, which left her exhausted. ROA.4938; ROA.4704-06, 4790-91. When their stepfather was home, he would be drinking and not involved in parenting ROA.4938-39. "[T]hese kids were left free to roam around, do whatever they wanted without supervision." ROA.4839.

With his father completely absent and lacking supervision, Alan Walker was vulnerable to the corrupting influence of very unhealthy male authority figures:

> [C]onnected with the absence of his father, there came, not surprisingly, a great deal of longing for father figures, which left him very vulnerable to the influence of some really unhealthy father -- people of his father's age or perhaps older, the fathers of his friends, who had a very damaging and corrupting influence on Alan.

ROA.4944.

Dr. Mendel described this pathologically toxic area:

> [T]his is an entire neighborhood in which, I've never seen a neighborhood, a small environment in which there was this degree of crossing of sexual boundary, incestuous relationships, sexual relationships across generations, and that entire constellation of sexual events had a huge impact on Alan, his brother Terry, I believe on all of the kids in this neighborhood.

ROA.4947. The neighborhood was compact. At the evidentiary hearing, Amanda sketched a map of the neighborhood showing how close together everyone lived. See ROA.5110.

Three men in particular played a significantly corrupting role in Walker's childhood and youth: Duke Maloney, "Big Jack" Collins, and Frank Potter. The first two of these had sons close in age to Walker. The third lived close by. ROA.4944-45; ROA.4747. These men, in their forties, provided alcohol and marijuana to Alan Walker and his friends.

Anita Frederick testified that Alan's friends often hung out at her house in the 28th Street neighborhood. When Alan was around fourteen years old, some of his closest friends were Billy Davenport, Donald Maloney, Dwayne Maloney, Jason Riser, and Aaron Castleberry. ROA.4746. Once, when Anita and Alan were at Duke Maloney's house, Alan showed his mother the closet where Duke Maloney grew his marijuana. ROA.4748.

Jack Collins had a particularly bad influence as he encouraged the boys to steal for him. ROA.4748-49; ROA.4945. As Anita Frederick testified, Collins "would have all these little boys off of 28th Street to go out and steal stuff from other

people's houses and bring it back." ROA.4749. On one occasion, the police came to the house and found stolen four-wheelers in her yard. ROA.4769-70. Duke Maloney's son, Dwayne, hid in Anita's bathroom until the police left. ROA.4749. Amanda Frederick also testified corroborated this testimony. ROA.4706-10.[12]

Frank Potter acted inappropriately around Amanda. On one occasion, he flashed Anita in front of Amanda. Walker became upset and spoke to Potter about his conduct. ROA.4708-09. Anita Frederick confirmed this. ROA.4776-77.

Terry Walker testified that the Maloney boys got into a lot of fights and that Alan's friends, he and Alan "would be corrupt and do things together." ROA.4838.

During the period beginning when Alan was 14 and under the influence of these older men, Alan's mother Anita felt she lost control, especially because she worked so much. ROA.4756-58.

### 3. Walker lacked the structure that his father had provided during his time in Alaska.

For several years after his parents' divorce, Alan Walker had no contact whatsoever with his father. ROA.4735, 4804. And other than the two separate years when Walker lived in Alaska, his father was not a part of his childhood and adolescence. ROA.4736-37. After he and Anita separated, Ronald moved to Alaska. He was there for about 3 ½ years before he heard from the mother of his sons.

---

[12] Leon saw Alan and his friends drinking with big Jack Collins and Duke Maloney at the lake. ROA.4866-67.

ROA.4804. Ronald testified that he was trying to find his sons, but Anita did not contact him after she moved to Mississippi. *Id*.

Ronnie describes Walker in these early years as a "great kid," and was complemented by his co-workers on Alan's good behavior. ROA.4806-07. Alan and Terry were required to clean their rooms, vacuum, and help with yard work while at his house, and earned allowances. ROA.4807. In general, both Alan and Terry complied with the rules of the home; Ronald had no serious behavior problems out of Alan Walker when he was a young child. ROA.4807. He and Walker did activities, such as fishing, as father and son. ROA.4808.

Ronnie recalled that Alan and Terry stayed in Alaska for one year during their first visit. ROA.4808. Walker visited Alaska for the second time when he was about 17, in 1982 or 1983. ROA.4809. On this visit, Ronnie states that Walker was not the same young man that he was during his first visit. ROA.4810. He described Walker as being stronger willed and a little rebellious during his second visit. *Id*.

For instance, Ronnie remembers that Walker rebelled when Ronnie asked him to get his hair cut. ROA.4810. He also described an occasion in which he got up for work one morning at around 6:00 am. He checked the boys' room, and he realized that they stayed out all night. ROA.4811. He decided to stay home from work that day, and when the boys came home, he spanked them. *Id*. Ronnie mentions that he did not care for the people Walker wanted to hang with, and did not like their

appearances. ROA.4811. He stated that "Alan was at the age he just didn't want to take on too much responsibility like that. He wouldn't want to listen to me." ROA.4811-12.

Ronnie says that he knew that Anita had problems with Walker when Anita would call and "try to ship him to Alaska." ROA.4812. He states that Anita wanted Walker to get away from Mississippi because he was involved in too many wrong things. ROA.4813. He testified that Anita wanted him to go to Alaska where he could have a father figure to "straighten him out and set him on the right road." ROA.4813. Ronnie believes that Walker would have stayed in Alaska, things would have been different. ROA.4813. He states that Alan was more like a momma's boy whereas "Terry had enough wisdom to stay in Alaska." ROA.4813.

Terry Walker provided testimony – and something of a life example – of the difference between his and Alan's father's household and their mother's. Terry moved to Alaska with his father in 1979 or 1980 when he was in seventh grade. ROA.4827. He previously spent one year with his father when he was in second grade and one year with his father when he was in fifth grade. ROA.4827.

In this regard, Terry described the differences in environments between his parents' homes. He says that life in Alaska was "pretty good." ROA.4837. He recalled that he had chores when he was in Alaska. ROA.4828. He described his father and stepmother as being "pretty into school," and added that he had "a little

more discipline" in Alaska. ROA.4828. The schooling was good. ROA.4238. He declared that "he wouldn't pass the life with his dad, stepmother and older brother's up for the world." ROA.4238.

### 4. Walker suffered neurological dysfunction often found in those who suffered trauma during childhood.

Neuropsychologist, Robert Shaffer, Ph.D., administered a number of objective tests and determined that Walker suffered significant defects in brain functioning often found in children who suffer abuse or trauma.[13] Before discussing the testing, Dr. Shaffer explained that the frontal lobe of the human brain, especially the prefrontal cortex is highly specialized and overlays the limbic system, which deals with drives, such as hunger or sexuality, as well as emotions. ROA.5040-41; ROA.5138. The prefrontal cortex plays a key role in inhibiting the expression of emotions. Thus, rather than automatically reacting in fear or rage, the prefrontal cortex enables individuals to think logically about the appropriate action to take. ROA.5041-42.

Dr. Shaffer also observed that there is a relationship between childhood trauma or trauma through life and brain functioning. In particular, children exposed to various traumas have problems with development of the left hemisphere of the brain, which result in difficulty with processing verbal information and verbal

---

[13] Dr. Shaffer described his professional experience, ROA.5028-32, and his curriculum vitae was admitted as Exhibit 4, ROA.5135; ROA.5032, and his report as Def. Exhibit 6. ROA.5046, 5139.

memory. ROA.5043. Similarly, people experiencing trauma may have a smaller hippocampus, which is a structure important for memory. In addition, the corpus callosum in individuals who have experienced trauma may have impaired functioning. ROA.5043.

Individuals who experience trauma may also have impaired executive functioning, which interferes with the appreciation of consequences of action and may interfere with the regulation of emotions. ROA.5044. Dr. Shaffer noted that "hostility and anger are much more prevalent in these adult individuals" and that "depression and anxiety are also more prevalent." ROA.5044.

Brain impairment from trauma also extends to the limbic system, including the amygdala. Signals from the amygdale must combine with information from the computing center of the brain in order to make appropriate judgment. ROA.5044.

Dr. Shaffer remarked that the type of trauma discussed by Dr. Mendel is associated with impaired brain functioning; likewise, alcohol consumption during adolescence may hinder brain development.ROA.5044-46.

Dr. Shaffer determined that Walker's neuropsychological profile "is consistent with that of individuals that have experienced various traumas during their developmental period." ROA.5046. Most of the testing indicated brain dysfunction, primarily in executive functioning. ROA.5048-5062.

After reviewing the results of the specific tests administered, Dr. Shaffer

repeated that Alan had impairments with frontal lobe executive functioning, impairment in his left hemisphere, and impairment in the transfer of information between the two hemispheres of the brain. ROA.5063. He also discussed the adverse effects of alcohol use on an already impaired brain. As he explained, "impulsive behaviors are committed more readily when somebody is under the influence of alcohol," and if that person also has the type of brain impairment found in Alan, then there is "independent contributions to disinhibition." ROA.5063-64.

Dr. Shaffer reiterated that when emotional triggers are absent, Alan functions within normal limits. Thus, he can attend to make routine daily activities, such as hold a job or care for his siblings. ROA.5064-65. Alan should also function well in a prison environment because he is subject to many consistent routines. ROA.5064.

**D. There is a reasonable likelihood that, hearing evidence of the genesis of Walker's dysfunctional sexual development, at least one juror would have voted for a life sentence.**

Walker satisfies the prejudice prong of the *Strickland* test despite the horrific nature of his crime. Evidence of a traumatic childhood has long been recognized as mitigating, and reviewing courts have found prejudice even in light of graphic crimes or crimes involving multiple victims. This is the particularly where, as here, the trauma Alan Walker faced as a young child and the disturbing things he was exposed to directly gives context to the crime committed, which the jury never had the opportunity to consider at trial. *See Anderson v. Sirmons,* 476 F.3d 1131, 1148

(10th Cir. 2007), the Tenth Circuit found prejudice because "the absence of . . . readily available mitigation evidence left the jury with no explanation for the murders.".

For instance, in *Williams v. Taylor,* 529 U.S. 362 (2000), the State presented two experts regarding Williams's likelihood of being a future danger and evidence of several other violent felonies he committed before and after the capital murder. *Id.* at 368. Similar to this case, the defense only presented brief testimony about some of Williams's good characteristics. *Id.* at 369. In collateral proceedings, however, Williams's new counsel provided evidence of abuse, mistreatment, and neglect during early childhood as well as evidence of cognitive limitations. *Id.* at 370-71.

In finding prejudice, the Supreme Court stressed that while the evidence adduced at trial "may not have overcome" the prosecution's evidence of aggravating factors, "the graphic description of [the defendant's] childhood, filled with abuse and privation, or the reality that he was 'borderline mentally retarded,' might well have influenced the jury's appraisal of his moral culpability." *Id.* at 398.

Similarly, in *Rompilla v. Beard*, 545 U.S. 374 (2005), the defendant was convicted of a heinous offense, and two of the aggravating circumstances included that the murder was committed by torture and that the defendant had a significant history of prior violent convictions. *Id.* at 378. The defense presented brief testimony from five witnesses, primarily that they still believed the defendant to be innocent

and that they believed him to be a good man. *Id.* Had Rompilla's attorneys performed an adequate investigation, they would have found evidence of his childhood and mental health very different from what they had seen. *Id.* at 390-91. Available records showed that Rompilla grew up with violently alcoholic parents and later became an alcoholic, which was a factor in his prior offenses. *Id.* at 391-93. Based on the newly developed mitigating evidence, the Supreme Court reversed Rompilla's death sentence. *See also Sears v. Upton*, 561 U.S. 945, 948-950 (2010) (prejudice found in light of evidence of abusive parents, behavior problems, sexual assault, deficits in mentality and impulse control, head injuries and substance abuse).

Other reviewing courts have found prejudice from a violation of the right to the effective assistance of counsel, even when the facts of the case were highly aggravated. *See, e.g., Williams v. Stirling*, 914 F.3d at 318-19 (finding prejudice where counsel failed to present evidence of Fetal Alcohol Syndrome, because such information would have given the jury a better understanding of what led the petitioner to commit the crime, which involved holding his girlfriend hostage and shooting her when she tried to escape); *Noguera v. Davis,* 5 F.4th 1020, 1027, 1044 (9th Cir. 2021) (finding prejudice even though the petitioner, who had priors, committed a rape/murder and severely beat the victim, inflicted "extensive facial injuries," fractured her skull, and tore her scalp loose from her head); *Haliym v. Mitchell*, 492 F.3d 680 (6th Cir. 2007) (prejudice found though petitioner was

involved in the stabbing death of two people); *Hamblin v. Mitchell,* 354 F.3d 482 (6th Cir. 2003) (despite a crime in which the defendant inflicted blunt force trauma on the victim and shot a park ranger in the leg, prejudice found because trial counsel failed to present evidence of difficult childhood and violent surroundings as well as mental health conditions); *Mason v. Mitchell,* 543 F.3d 766, 769 (6th Cir. 2008) (prejudice found even though the petitioner raped a woman and beat her to death using "a blood-stained board with protruding nails"); *Jells v. Mitchell,* 538 F.3d 478 (6th Cir. 2008) (prejudice found even though petitioner beat a woman to death as her four-year-old child watched).[14]

Courts also find prejudice with evidence of neurological impairments, which diminishes a defendant's moral culpability. *See Abdul-Salaam,* 895 F.3d at 262-63 (prejudice found in part due to evidence of cerebral dysfunction and expert testimony about childhood abuse impairing ability to make judgments as an adult); *Ferrell v. Hall*, 640 F.3d 1199, 1235 (11th Cir. 2011); *Frazier v. Huffman,* 343 F.3d 780, 794-96 (6th Cir. 2003) (counsel ineffective for failing to present evidence of brain injury and lack of impulse control that reasonably resulted from it); *Lockett,* 230 F.3d at 714 (brain damage rendered defendant "less morally culpable").

After addressing the performance prong of *Strickland's* test, the Mississippi

---

[14] The court also faulted defense counsel for waiting too long to begin penalty phase preparation and failing to secure investigative assistance. *Id.* at 497.

Supreme Court declined to reach the prejudice prong. *Walker IV*, 303 So. 3d at 728. Thus, in applying § 2254(d), this Court should look to the decision of the trial court, which found that the mitigation evidence offered at the PCR hearing "would not have changed the jury's verdict" in light of the evidence as to the murder. ROA.4534-35.

The state trial court's determination is unreasonable in several respects. In weighing the evidence in mitigation against the aggravating circumstances, the lower court misconstrued the jury's finding. Second, the lower court misapplied the *Strickland* prejudice test by focusing on how "the jury" may have received the mitigating evidence instead of whether there is a reasonable probability that just one juror would have been swayed to vote for a life sentence. Third, the lower court unreasonably discounted lay and expert witnesses, who testified without rebuttal from the State. The trial court inaccurately asserted much of the testimony did not pertain to Walker, ROA.4533, and criticized the unrebutted expert testimony for allegedly relying on unverified information, rumor, and mere speculation. ROA.4533. Fourth, contrary to unambiguous case law, the trial court believed that most of the evidence presented at the post-conviction hearing would have been barred at trial. Fifth, the trial court overlooked some of the most compelling mitigating evidence.

In weighing the new mitigating evidence against the aggravating

circumstances, the lower court emphasized a factor rejected by the jury. The trial court twice characterized the murder as heinous. Importantly, however, the sentencing jury did not find the aggravating circumstance that "the capital offense was especially heinous, atrocious or cruel." *See* ROA.4535 (reciting the aggravating factors returned by the jury). The Mississippi statutory scheme requires jurors to weigh mitigating circumstances against "the aggravating circumstances found to exist." Miss. Code Ann. §99-19-101(2)(c).[15] This narrowed weighing is critical to the constitutionality of the Mississippi capital sentencing statutes. *See Stringer v. Black*, 503 U.S. 222, 229, 235-36 (1992) ("Under Mississippi law, after a jury has found a defendant guilty of capital murder and found the existence of at least one statutory aggravating factor, it must weigh the aggravating factor or factors against the mitigating evidence"). In this context, the great weight given by the lower court to what it characterized as the heinous facts of Ms. Edwards' murder was misplaced.

Walker is only required to show, by a preponderance of the evidence, that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 694. In *Lockett v. Anderson*, 230 F.3d 695 (5th Cir. 2000), the Fifth Circuit noted that

---

[15] The trial court referred to the Mississippi Supreme Court's review on direct appeal of the evidence of the murder in the context of the proportionality of the death sentence. ROA.4535, n.18. This review, however, is conducted under Miss. Code Ann. § 99-19-105, a statute that does not apply to the jury's consideration of the appropriate sentence.

under Mississippi law, a death sentence requires unanimity. *Id*. at 716 (citing Miss. Code Ann. § 99-19-103). *See also Wiggins*, 539 U.S. at 537 ("Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance").

In contrast, the trial court found that the mitigation presented at the evidentiary hearing "is simply not the type of evidence from which this Court could find that the jury would have reasonably likely opted for a life sentence had it been presented at sentencing. ROA.4534. By focusing on what would have changed the minds of the jury as a whole, the lower court held Walker to a higher standard than is allowed under Federal constitutional law.

The lower court dismissed much of the lay testimony, asserting that much of it did not pertain to Walker. ROA.4533. The lower court was incorrect. As discussed above, Walker presented testimony from his parents and siblings about his upbringing, the environment in which he lived, and the toxic influences on his life, and this testimony was used by Dr. Mendel in conducting his evaluation. Walker's parents and his Aunt Nellie Richards did testify about their lives before Walker was born, but that type of history is an essential part of the defendant's social history. *See* 1989 ABA Guideline 11.4.1, § D.2.C.

The lower court also denigrated Walker's experts for supposedly basing

opinions "based on unverified information (and in some instances rumor and mere speculation." ROA.4533. There is nothing in the record to suggest Dr. Shaffer relied on "unverified information" in conducting his neuropsychological testing; thus, the state court factual finding is unreasonable. *See Neal v. Vannoy,* 78 F.3d 775 (5th Cir. 2023). These objective measures to uncover the profound impairments in Walker's cognitive functioning bear no relation to "rumor and mere speculation." Dr. Shaffer also testified that the type of impairments found are frequently found in those experienced childhood trauma. With this evidence, he could explain the link between Walker's upbringing, his brain impairments, and his susceptibility to lose his ability to exercise appropriate judgment when placed in emotionally charged situations.[16]

Dr. Mendel carefully explained the sources of his opinions, including personal interviews with members of Walker's family and other individuals who knew him. He also observed the testimony of the lay witnesses. Many of the witnesses corroborated each other and enabled Dr. Mendel to identify a number of significant events and traumas affecting Walker. The lower court discounted Dr. Mendel's

---

[16] Dr. Shaffer put to rest the suggestion in the Maggio report that Walker "appears to be an Antisocial Personality Disorder." ROA.5145, Sealed Exhibit, at 2. Dr. Maggio did not reach a conclusion to a reasonable degree of medical certainty, nor could he have done so given the scant social history available to him. Dr. Shaffer, with the aid of a thorough social history and testing, found Walker's problems when encountered with emotional triggers do not make him a sociopath. A sociopath has no feelings and makes strategic decisions. Someone with his type of prefrontal cortex impairment, "after the experience, reflecting back, have a full range of emotion. Full range of regret, remorse, feelings of sorrow about what happened. But it's leading up to the incident, the ability to predict those feelings is absent." ROA.5058-59.

testimony regarding the impact of the sexual abuse suffered by Alan and his brother Terry only because of discrepancies in sources of information about the age of the boys when the abuse took place. ROA.4533, n.17. The lower court added: "It is totally speculative that this caused the trauma Dr. Mendel associated with it." ROA.4533, n.17. Dr. Mendel, however, is an expert regarding trauma, in particular sexual abuse. In his testimony, he acknowledged the discrepancy regarding age, but concluded it did not make a difference in his conclusions. ROA.5019. Moreover, the State presented no contrary evidence even though it had an expert sitting in the courtroom.

The lower court also accused Dr. Mendel of speculation concerning an assertion as to whether Walker had a sexual relationship with his mother. ROA.4533, n. 17. Dr. Mendel, however, did no such thing. He mentioned he heard some information suggesting but did not have sufficient evidence to reach a conclusion about that. As a result, he did not consider that suggestion when reaching his conclusions. ROA.5025.

The Supreme Court has cautioned against unreasonably discounting expert mitigation testimony even if the State presents contrary testimony challenging a petitioner's experts. "While the State's experts identified perceived problems with the tests that [the expert] used and the conclusions he drew from them, it was not reasonable to discount entirely the effect that his testimony might have had on the

jury or the sentencing judge." *Porter*, 558 U.S. at 455. It also chided the Florida Supreme Court for "unreasonably discounting the evidence of Porter's childhood abuse and military service. It is unreasonable to discount to irrelevance the evidence of Porter's abusive childhood, especially when that kind of history may have a particular salience for a jury evaluating" the circumstances regarding the offense. *Id.*

By discounting lay and expert testimony, the lower court unreasonably *Strickland*'s prejudice test. The court substituted its view of the testimony instead of asking whether there was a reasonable probability one juror would have been convinced to vote for a life sentence. Dr. Mendel, a highly qualified expert in the field of assessing the impact of trauma, conducted a thorough evaluation, interviewing number people and carefully sifting through the information to determine what information was corroborated. Furthermore, Dr. Mendel's conclusions were supported by the neuropsychological testing, which found deficits in brain function typically found in individuals who suffered trauma.

The trial court also improperly diminished Walker's evidence by suggesting "much of petitioner's evidence, upon proper objection, would likely have been excluded from jury consideration at a sentencing trial." ROA.4532, n.15. The state court claimed that "several witnesses offered speculative testimony, generous amounts of (double) hearsay, and much of it was cumulative." The court did not offer examples, and Walker relied only on evidence allowed into evidence at the

85

hearing. Of the alleged hearsay, the lay witnesses largely confined themselves to testifying about matter about which they had personal knowledge. More significantly, the Mississippi Supreme Court has unambiguously held that the rules of evidence do not apply at sentencing proceedings. *See Hutto v. State,* 227 So. 3d 963, 993-94 (¶ 110) (Miss. 2007); *Wilson v. State,* 21 So. 3d 572, 587-88 (¶¶ 41-42) (Miss. 2009); *Randall v. State,* 806 So. 2d 185, 231-32 (Miss. 2001). In fact, it has stressed the need to permit a defendant to introduce virtually any evidence that is relevant and reliable about a defendant's life and that may be offered as a basis for a juror to vote for a life sentence. *Fulgham v. State,* 46 So. 3d 315, 336 (Miss. 2010).

The state court noted the need to weigh the mitigating evidence against the aggravating evidence, but in its review of the evidence to be weighed, it disregarded key mitigating evidence and identified the details of the crime, making it appear that a death verdict was a foregone conclusion. According to the lower court, lay witness testimony "revealed Walker drank beer as a teenager, stole 'stuff' with friends, had teenage and older friends who were bad influences, and that his mother's method of discipline for her children was to spank them with a belt." ROA.4533. The "older friends" were actually older men who encouraged the boys to drink and steal for them. Also, the lower court did not even mention the openly incestuous relationship his step-father had with a young niece or that in the community in which he was raised, older men had sexual relationships with young girls. Many of the lay

witnesses recounted Leroy Marroy, a man somewhere between 40 and 50 years old beginning a relationship with an eleven-year-old girl in the community who was sent to live with him in exchange for her family receiving household appliances. ROA.4750-51. Immersion in this toxic environment had a profound impact on Walker's development and created serious problems for his romantic relationships.

By sidestepping some of the most important mitigating evidence and emphasizing the horrific details of the crime, the lower court employed a "brutality trumps" approach—*viz.*, the "stereotypical fall-back argument that the heinous and egregious nature of the crime would have ensured assessment of the death penalty." *Gardner v. Johnson*, 247 F.3d 551 (5th Cir. 2001); *see also Walbey v. Quarterman*, 309 F. App'x 795, 804 (5th Cir. 2009).

There are also many examples of jurors responding favorably to mitigating evidence even in some of the most heinous crimes. For instance, Terry Nichols, Timothy McVeigh's codefendant in the Oklahoma City Bombing case, was involved in the murder of one hundred sixty- eight (168) victims, but he received a life sentence. Zacharias Moussaoui was the 20th hijacker responsible for the 911 terror attacks. There were two thousand nine hundred and seventy-seven (2,977) victims, but he, too, received a life sentence. There are other examples of defendants

receiving life sentences despite being convicted of horrendous murders.[17]

In this case, because of trial counsel's deficient performance, the jury knew virtually nothing about Alan Walker, the traumatic circumstances in his life, or how those circumstances help explain and give context to his actions. Failure to present mitigation evidence that provides a context for understanding a capital defendant's

---

[17] *See e.g. United States v. Bass*, 460 F.3d 830, 833 (6th Cir. 2006) (imposing life sentence on defendant for four drug-related murders); *United States v. Beckford*, No. 97-4924, 211 F.3d 1266, at *4 (4th Cir. 2000) (per curiam) (Westlaw) (imposing life sentence on defendant for six drug-related murders); *United States v. Johnson*, 219 F.3d 349, 351 (4th Cir. 2000) (imposing life sentence on defendant for five drug-related murders); *United States v. Pitera*, 5 F.3d 624, 625 (2d Cir. 1993) (imposing life sentence on defendant for seven drug-related murders in which the victims were tortured and their bodies dismembered); *United States v. Williams*, No. 00 Cr. 1008, 2011 WL 3296101, at *1 (S.D.N.Y. July 28, 2011) (imposing life sentence on defendant for execution-style triple murder); *United States v. Kehoe*, No. 4:97-CR-00243-(1), 2008 WL 4079316, at *2 (E.D. Ark. Aug. 28, 2008) (imposing life sentence on defendant for murdering two adults and a small child); *United States v. Moore*, No. 00-157-2, 2005 WL 6797098, at *1 (D.D.C. Mar. 9, 2005) (imposing life sentence on defendant for thirty-one drug related murders); *United States v. Edelin*, 134 F. Supp. 2d 59, 63 (D.D.C. 2004) (imposing life sentence on defendant for fourteen drug-related murders); Carol D. Leonnig, *2 Top Bosses of 'Murder Inc.' Get Life Terms*, WASH. POST, Mar. 10, 2005, at B1; Carol D. Leonnig, *D.C. Gang Leader Blames System for Crime*, WASH. POST, Dec. 18, 2004, at B4; *see also United States v. Gilbert*, 92 F. Supp. 2d 1, 2-3 (D. Mass Mar. 26, 2001) (imposing life sentence on a Virginia nurse who murdered four patients and attempted to murder three others); *United States v. Al-'Owhali*, 691 F. Supp. 2d 441, 441 (S.D.N.Y. 2010) (imposing life sentence on defendant for involvement in the terrorist bombing at American embassies that killed 224 people); Phil Hirschkorn, *Four Embassy Bombers Get Life*, CNN (Oct. 21, 2001), http://www.edition.cnn.com/2001/LAW/10/19/embassy.bombings; *see, e.g.*, U.S. DEP'T OF JUSTICE, CRIMINAL CALLS: A REVIEW OF THE BUREAU OF PRISONS' MANAGEMENT OF INMATE TELEPHONE PRIVILEGES, (1999), *available at* http://www.justice.gov/oig/special/9908/callsp51.htm (reporting on the case of Anthony Jones, who was sentenced for life for six drug-related murders); *cf. United States v. Alexis Candelario Santana*, Crim. No. 09-427, 2013 WL 101615, at *2 (D.P.R. Jan. 8, 2013) (imposing life sentence on defendant for "La Tombola Massacre" in which eight people were killed; defendant previously convicted of killing or ordering others to kill thirteen others he viewed as threats or disloyal); *No Death Penalty for P.R. Mass Killer*, UPI (Mar. 25, 2013, 8:04 PM), http://www.upi.com/Top_News/World-News/2013/03/25/No-death-penalty-for-PR-mass-killer/UPI-14261364256284/.

actions can be prejudicial, even where those actions are considered horrific. *Sears v. Upton,* 561 U.S. 945, 951 (2010) (mitigating evidence "might well have helped the jury understand Sears, and his horrendous acts").

This new evidence, then, "might well have influenced the jury's appraisal of [Petitioner's] moral culpability" and led at least one juror to vote for a sentence less than death. *Wiggins v. Smith,* 539 U.S. at 538 (citation omitted). The trial court's contrary determination involved unreasonable applications of established precedent or unreasonable factual determinations based on the evidence before it.

## CONCLUSION

The state courts' rulings on Walker's *Batson* and *Strickland* claims were contrary to and an unreasonable application of those cases and their progeny. The state courts' decisions on both claims were based on an unreasonable determination of the facts in light of the evidence presented. This Court should grant a certificate of appealability on both claims.

Respectfully Submitted,

*/s/ David P. Voisin*
David P. Voisin, MSB #100210
P.O. Box 8044
Hammond, LA 70404
(601) 842-0332 (c)
david@dvoisinlaw.com

*/s/ James W. Craig*
James W. Craig, MSB # 7798
Hannah Lommers-Johnson
The Roderick & Solange MacArthur
      Justice Center
4400 South Carrollton Ave.
New Orleans, LA 70119
(504) 620-2259 (p)/(504) 208-3133 (f)
jim.craig@macarthurjustice.org


COUNSEL FOR PETITIONER-
APPELLANT

### III.    CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C) and 5th Cir. R. 32.3, the undersigned acknowledges that this application for a COA exceeds the type-volume limitations of 5th Cir. R. 32.2, but has filed a motion for leave to exceed those limits.  The foregoing COA application, exclusive of this Certificate, the Certificate of Service, and the tables of contents and authorities, contains 19,519 words. The document was created with Microsoft Word for Windows 365 MSO Version 2605.  It is printed using Times New Roman font in 14 point variable space font and 12 point variable space font in the footnotes.

I understand that a material misrepresentation in completing this certificate, or circumvention of the type-volume limits, may result in the Court's striking the brief and imposing sanctions against the person signing the brief.

*s/ James W. Craig*
James W. Craig

# IV. CERTIFICATE OF SERVICE

I certify that I have served the foregoing Motion for a Certificate of Appealability via the Court's ECF system on Counsel for Respondent.

This the 5th day of June 2026.

*s/ James W. Craig*
James W. Craig